The STATE of Colorado; Roy Romer, Governor of the State of Colorado; Department of Administration, State of Colorado; and Forrest Cason, Executive Director, Department of Administration, Petitioners,

v.

The FREEDOM FROM RELIGION FOUNDATION, INC., a Wisconsin Non-Profit Corporation; the Colorado Chapter of the Freedom From Religion Foundation, Inc.; Jeff Baysinger; Howard Huguley; Glenn V. Smith; and Lee Whitfield, Respondents.

No. 93SC554.

Supreme Court of Colorado,
En Banc.

June 12, 1995.

Rehearing Denied June 30, 1995.

Gale A. Norton, Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., Dianne E. Eret, Asst. Atty. Gen., Gen. Legal Services Section, Denver, for petitioners.

Robert R. Tiernan, Denver, for respondents.

Coghill & Goodspeed, P.C., John P. Baker and Susan D. Brienza, Denver, for amicus curiae American Civil Liberties Union.

Justice SCOTT delivered the Opinion of the Court.

In this case we must determine whether the content and context of a monument, donated to the State for a secular purpose but containing a message of both religious and secular value, displayed among other monuments and tributes on the grounds of the State Capitol, violate the constitutional provisions prohibiting the establishment of or any preference to religion. We conclude that under the facts of this case they do not.

## I

The Freedom From Religion Foundation, Inc., a Wisconsin non-profit corporation, the Colorado Chapter of The Freedom From Religion Foundation, Inc., and several individual citizens (collectively referred to as "respondents"), plaintiffs below, sought removal of a monument of the Ten Commandments located on state property. The trial court found that the monument did not violate the applicable constitutional provisions [1] and the court of appeals reversed. *Freedom From Religion Foundation, Inc. v. State of Colorado*, 872 P.2d 1256 (Colo.App.1993). The State of Colorado, Roy Romer, Governor of Colorado, the Colorado Department of Administration

---

1. The two provisions at issue are the Establishment Clause, U.S. Const. amend. I, which provides that "Congress shall make no law respecting the establishment of religion," and our own Preference Clause, Colo. Const. art II, § 4, which prohibits "preference ... to any religious denomination or mode of worship."

and the Department's executive director (collectively referred to as "State" or "petitioners"), sought review of the court of appeals' judgment, which held that the monument "conveys an essential religious message that would appear to the reasonable observer to be endorsed and approved by the state because of its contents and its location on the property of the state...." *Id.* at 1265. As previously directed by the court of appeals, the trial court applied the legal standard we set forth in *Conrad v. City and County of Denver,* 656 P.2d 662, 672 (Colo.1983) (*Conrad I*), and ruled the monument does not offend the Establishment or Preference Clauses. On review[2] we now apply that standard as enlightened by subsequent Supreme Court decisions, and we accordingly reverse.

## II

Although the evidentiary facts presented to the trial court are largely undisputed, they are essential to a complete understanding of this case. Therefore, we reiterate in detail the evidence in the record and the facts derived at trial.

## A

In the city of Denver, Colorado, there are adjoining parcels of tree-lined property owned by the State of Colorado and the City and County of Denver. At the east end of the property sits the State Capitol Building and a square block of park. Although a portion of the grounds around the Capitol includes an access street and area for parking, it is landscaped with lawn and trees.

Directly west of the State Capitol Building, across Lincoln Street, is a one-square-block park, owned by the State, known as "Lincoln Park." Lincoln Park, just south of downtown Denver, is bounded by four highly traveled streets: Colfax Avenue on the north, East Fourteenth Avenue on the south, Lincoln Street on the east, and Broadway Street on the west. Lincoln Park is landscaped with lawn and a number of trees.

The State Capitol grounds and Lincoln Park make up a three-block area called the "Capitol Complex Grounds." Within the Capitol Complex Grounds are several monuments. On the east side of the Capitol there is a large statue of a Native American and a buffalo which was placed on the grounds in the early 1900s. In front of the Capitol's west entrance is a monument to soldiers who served and died in the Civil War, including a statue of a Union Soldier and two canons that were used during the Civil War. Other commemorative areas include a bench dedicated as a Pearl Harbor monument and an Aspen grove, comprised of seven trees, that was planted in memory of the Challenger Astronauts who perished in the tragic space shuttle disaster several years ago. There are also numerous arboreal tributes in honor of non-military activities and events ranging from Arbor Day to soil conservation efforts.

Near the center of Lincoln Park at a point where two pedestrian walkways meet, there has been erected a Washington monument-type structure, the Veterans War Memorial. Dedicated to the veterans of all of our nation's wars, that memorial rises to a height of approximately forty-five feet, making it much taller than all of the other monuments and the most prominent structure in the park, with all pathways leading to its base. The Veterans War Memorial is centered on a visual line between the State Capitol Building and the Denver City and County Building.

2. We granted certiorari in order to decide whether:
 1. The court of appeals' opinion engaged in impermissible appellate fact-finding, for instance, in determining the context of the monument [in a State park], contrary to the explicit finding of the trial court.
 2. The court of appeals' opinion improperly relied upon school setting cases.
 3. The court of appeals' opinion contravenes precedent by concluding that it is axiomatic

that the religious nature of the monument [in a State park] makes it unconstitutional.
 4. The court of appeals' opinion misapplied the holdings in *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980); *Allegheny County v. American Civil Liberties Union,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); and *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

Throughout Lincoln Park there are several other monuments of various sizes. A statue more than twenty-feet tall stands in the park's northeast quadrant in tribute to a World War II Hispanic Congressional Medal of Honor recipient, J.P. Martinez, and commemorates the participation of Coloradans of Hispanic descent in that and other wars. The J.P. Martinez Statue is north of the Veterans War Memorial.

South of the Veterans War Memorial in the southeast quadrant of the park stands a replica of the Liberty Bell. Like the original Liberty Bell, the replica contains a phrase in raised letters taken from Leviticus in the Old Testament of the Bible, which reads: "Proclaim liberty throughout the land and unto all the inhabitants thereof." [3] In the northwest quadrant and close to the intersection of Colfax Avenue and Broadway Street is a drinking fountain dedicated to the memory of Sadie M. Likens, who aided war survivors in the early part of this century. Also near the center of the park and across from the Veterans War Memorial near Broadway Street is a flagpole honoring those who served in the military campaign known as the Spanish–American War.

The monument that has spurred this litigation is the Ten Commandments monument, which is located in the northwest quadrant of Lincoln Park, some forth to fifty feet from the intersection of Colfax Avenue and Broadway Street. The Ten Commandments monument is located adjacent to the walkway that runs in a generally northwest-southeast direction across the park. It is approximately fifty feet west of the much larger twenty-foot tall J.P. Martinez Hispanic Veterans Memorial and about thirty feet east of the larger drinking fountain monument.

The Ten Commandments monument is made of stone and is three to four feet high and about two and one-half feet wide. It is sculpted in the form of two tablets. At the top of each tablet is a floral design that surrounds the representation of two other tablets. Inside these latter tablets are symbols which were identified at trial as Phoenician letters but which form no intelligible

words in that or any known language. Between the two tablets on this monument is an eye within a triangle—an "all-seeing eye" similar to that depicted on the one-dollar bill. Expert testimony indicates that this Egyptian symbol is generally considered to be secular in nature, although some people view it as representing the eye of God. Immediately below this symbol is an American eagle which is grasping an American flag.

A unique version of the text of the Ten Commandments is immediately below the American flag. It reads as follows:

### THE TEN COMMANDMENTS

I AM the LORD thy God

I. Thou shalt have no other gods before me.

II. Thou shalt not take the name of the Lord thy God in Vain.

III. Remember the Sabbath day to keep it holy.

IV. Honor thy father and thy mother that thy days may be long upon the land which the Lord thy God giveth thee.

V. Thou shalt not kill.

VI. Thou shalt not commit adultery.

VII. Thou shalt not steal.

VIII. Thou shalt not bear false witness against thy neighbor.

IX. Thou shalt not covet thy neighbor's house.

X. Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

Below this text there are two stars of David, symbols of the Jewish religion, located one in each corner. Between the two stars of David, in the center, are two Greek letters, Chi and Rho, one superimposed upon the other, which is a symbol for the first two letters in the name "Jesus Christ" developed by the early Christian church and still found in many Catholic churches. At the very bottom of the monument appears a scroll with these words:

---

3. *The Holy Bible,* King James Version, Lev. 25:10. Respondents did not take issue with this biblical text nor did they seek the removal of the Liberty Bell replica from Lincoln Park.

PRESENTED
BY MEMBERS OF
FRATERNAL ORDER OF
EAGLES
OF COLORADO

B

In 1943, a Minnesota juvenile court judge decided to address what he perceived as a need of many juveniles he had encountered in his court. Believing these juveniles were "without any code of conduct or standards by which to govern their actions," the judge thought "they could benefit from exposure to one of mankind's earliest codes of conduct, the Ten Commandments." He made clear, however, that such exposure "was not to be a religious instruction of any kind." The juvenile judge decided to post a copy of the Ten Commandments in state juvenile courts across the country as part of a nationwide youth guidance program. The judge was of the opinion that the commandments would demonstrate to the youths coming in contact with the juvenile courts that there were long "recognized codes of behavior to guide and help them."

As chair of the Youth Guidance Committee of the Fraternal Order of Eagles (the "Eagles"), the judge presented his ideas to the Eagles for financial support. Initially the Eagles rejected the notion of sponsoring the National Youth Guidance Program because it was felt that such distribution "might seem coercive or sectarian." However, after representatives of the Jewish, Protestant, and Catholic faiths were able to develop a version of the Ten Commandments which was not identified with any particular religious group,[4] the Eagles agreed to support such a youth guidance program.

At the same time, the juvenile judge received a telephone call from motion picture producer Cecil B. DeMille, who was then producing the movie "The Ten Commandments." Mr. DeMille suggested distributing copies of the Ten Commandments to coincide with the release of the movie. As a promotion of his movie, no doubt, Mr. DeMille suggested that bronze plaques be produced with the Ten Commandments imprinted for distribution throughout the country. Because "the original Ten Commandments were on granite," the judge suggested and DeMille agreed that stone or granite tablets produced by local Minnesota granite companies would be "more suitable." Various local chapters or "aeries" of the Eagles paid for the stone monuments and donated them as part of the youth guidance program to several local and state governments, including Colorado.

Since the monument was placed at Lincoln Park, maintenance costs have been minimal. The State does not allocate funds to maintain the monument; however, the State has used its employees at least once in the past thirty-five years to remove graffiti placed on the monument by vandals and to clean it on occasion.

III

In March of 1989, after Governor Romer refused a written request that the monument be removed from Lincoln Park, the respondents filed this civil action in the District Court for the City and County of Denver alleging a violation of the First Amendment Establishment Clause, U.S. Const. amend. I, and the Colorado Preference Clause, Colo. Const. art. II, § 4, and seeking removal of the monument. Initially the trial court granted summary judgment in favor of the State. However, its ruling was reversed and the case was remanded with directions to consider "the nature of the use to which the particular [public] property is devoted, the nature and purpose of the particular monument, its placement, its proximity to and juxtaposition with other memorials in the same public area, and the nature of the forum and its effect upon the audience to which it is directed" in light of *Conrad I,* 656 P.2d 662 (Colo.1982), and *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *Freedom From Religion Foundation, Inc. v. State of Colorado,* No. 89CA1937 (Colo.App. Feb. 7, 1991) (not selected for official publication).

4. The version agreed upon is the same version which is now inscribed on the monument in

Lincoln Park.

On remand by the court of appeals, a trial was held which included the testimony of several lay and expert witnesses as well as documentary evidence. The trial court again entered judgment for the State. Based on the evidence presented, the trial court ruled that although the monument conveyed a message that had both a religious and a secular meaning, the monument was not displayed with any intent to foster the religion of any particular sect. The trial court's determination is consistent with the evidence presented as to the intent of the Eagles and the purpose of their gift to the State, including the testimony of numerous expert witnesses that the Ten Commandments are the basis for many of our secular laws. For example, Gilbert Horn, the Executive Director of the Colorado Council of Churches, testified:

> I don't think you could find a history book anywhere that does not indicate that the same kind of law and moral imperatives contained in the Ten Commandments, which are also contained in the laws and the prescriptions of other world religions, ... certainly serve a secular purpose in the sense they seek to bind a society together [with] commonly shared values.

Similarly, Dr. Clarence Snelling, Jr., a theology professor, testified as follows:

> The Ten Commandments ... has been instrumental to the ethical background of quite a number of cultures, and particularly was part of the background of the framers of the United States Constitution, those who wrote the ten amendments to the Constitution. It is very definitely a part of their cultural background. That material not only shows up in their history, but shows up even more so in the general legal background of English Common Law which precedes the North American experience of what we call our Constitutional government and of the Napoleonic Code, which was instrumental in the formation of the legal code from Louisiana west to California. So this material, though of a religious source, has functioned as part of the generalized culture ethic for many, many, many generations across hundreds of

years to a great extent through all of western Europe and now North America. Gregory Robbins, a theology expert, testified similarly. The testimony of these experts was undisputed.

The trial court concluded that the monument is one of "a number of monuments," which overall contain symbols of various historic events or concepts associated with American history. Further, the trial court ruled that the monument itself was "a melange of civil, political, cultural, and religious meanings." The trial court concluded that because the monument did not have the overall effect of fostering, preferring, or establishing any religion, its continued existence on state property would not violate the Establishment Clause of the First Amendment or the Preference Clause of our State Constitution.

The court of appeals reversed the trial court's ruling, finding that the monument, as it is presently located and displayed, offends against the controlling constitutional provisions. *Freedom From Religion Foundation,* 872 P.2d at 1256. The court of appeals found that the monument in question was, in fact, "isolated," and that the context under which the monument was displayed by the State did not include several monuments. *Id.* Relying on *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), the court of appeals then concluded that the "overriding significance" of the text of the monument in its entirety conveys an "essential religious message." *Freedom From Religion Foundation,* 872 P.2d at 1265. The court of appeals held, therefore, that the monument's presence communicates government endorsement of the religious content and is thus unconstitutional. *Id.*

On review, pursuant to the standard set forth by the United States Supreme Court, *see infra,* section IV A, we must determine whether the presence of the Ten Commandments monument on state property communicates a prohibited endorsement or disapproval of religion. We hold that the monument's content [5] and its setting among sever-

---

**5.** By our use of the term "content" we include everything that appears on the face of the monu-

ment, including both the language of the Ten

al much more prominent monuments in Lincoln Park and throughout the Capitol Complex Grounds sufficiently neutralize its religious character resulting in neither an endorsement nor a disapproval of religion. Accordingly, we reverse the judgment of the court of appeals.

## IV

It is a primary principle of the Federal Establishment Clause and our own Preference Clause jurisprudence that one religious denomination cannot be preferred over another; nor can government favor religion over non-religion or non-religion over religion. Article II, section 4, of the Colorado Constitution provides:

> The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed; and no person shall be denied any civil or political right, privilege or capacity, on account of his opinions concerning religion; but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, excuse acts of licentiousness or justify practices inconsistent with the good order, peace or safety of the state. No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent. *Nor shall any preference be given by law to any religious denomination or mode of worship.*

Colo. Const. art. II, § 4 (emphasis added). The last sentence of this provision is referred to as the Preference Clause. In interpreting our Preference Clause we have looked to the Establishment Clause of the First Amendment to the United States Constitution and the body of federal cases that have construed it. *See, e.g., Conrad v. City and County of Denver,* 724 P.2d 1309, 1313, 1315 (Colo.1986) (*Conrad II* ) (holding that the main intent or purpose of including a nativity scene in a holiday display on the steps of the Denver City and County building is to "promote a feeling of good will, to depict what is commonly thought to be the historical origins of a national holiday, and to contribute to Den-

ver's reputation as a city of lights"). Consistent with our precedent set in *Conrad II,* for purposes of review under our Preference Clause we see no need to depart from the path cut by the United States Supreme Court for Establishment Clause cases.

### A

The Establishment Clause provides: "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. The Establishment Clause is made applicable to the states by the Fourteenth Amendment. *See Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). As the Supreme Court has set forth, " '[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.' " *Allegheny County v. American Civil Liberties Union,* 492 U.S. 573, 605, 109 S.Ct. 3086, 3107, 106 L.Ed.2d 472 (1989) (quoting *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982)). Nor can government favor religion over non-religion. *Id.* at 593, 109 S.Ct. at 3100–01. The natural analog also requires then that we not prefer non-religion over religion. *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 305, 83 S.Ct. 1560, 1615, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring) ("The fullest realization of true religious liberty requires that government ... effect no favoritism ... between religion and non-religion."). Furthermore, we must not encourage the government to send a message to members of any religious groups that they are not fully accepted within our greater community. *See generally* Laurence H. Tribe, *American Constitutional Law* 1174 (2d ed. 1988) (hereafter "Tribe"); *see also Thomas Jefferson on Democracy* 108–117 (Saul K. Padover ed., 1939). The Establishment Clause plays a central role in guaranteeing religious freedom "by forbidding official actions that signify official endorsement or exclusion based on an individual's religious beliefs." Tribe at 1187–88.

It takes no more than a moment's reflection, however, to acknowledge that not

Commandments and the surrounding symbols and instructions.

every public action which indirectly involves religion is unconstitutional. We have adopted the view that a government act which has both a religious and secular message need not, in all instances, fall as a casualty of constitutional scrutiny. *See Conrad II,* 724 P.2d 1309. This reality was previously stated by the Supreme Court in *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). There, writing for a majority, Justice Douglas suggested:

> We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe.... [W]e find no constitutional requirement which makes it necessary for government to be hostile to ... religious influence.

*Id.* at 313–14, 72 S.Ct. at 684.

■ The Constitution does not require complete separation of church and state: "[I]t affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any. Anything less would require the 'callous indifference' we

have said was never intended by the Establishment Clause." *Lynch,* 465 U.S. at 673, 104 S.Ct. at 1359 (citing *Zorach,* 343 U.S. at 313–14, 72 S.Ct. at 683–84). The *Lynch* Court explained: "In every Establishment Clause case, we must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the Court has so often noted, total separation of the two is not possible." *Id.* at 672, 104 S.Ct. at 1359.[6] "[O]ur precedents plainly contemplate that on occasion some advancement of religion will result from governmental action." *Id.* at 683, 104 S.Ct. at 1364 (O'Connor, J., concurring). Nonetheless, " 'not every law that confers an "indirect," "remote," or "incidental" benefit upon [religion] is, for that reason alone, constitutionally invalid.' " *Id.* (quoting *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 771, 93 S.Ct. 2955, 2964–65, 37 L.Ed.2d 948 (1973)); *see also Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (noting that "a religious organization's enjoyment of merely 'incidental' benefits does not violate the prohibition against the 'primary advancement' of religion").

In *Lynch,* the Court upheld the display of a creche as part of an overall holiday display.[7] The Court discussed the historical role of religion in American society and concluded that "[t]here is an unbroken history of official acknowledgement by all three branches of government of the role of religion in American life from at least 1789." *Lynch,* 465 U.S. at 674, 104 S.Ct. at 1360. The Court set forth several illustrations of the government's acknowledgement of our religious heritage and governmental sponsorship of graphic manifestations of that heritage, including religious exhibits in art galleries and the depiction of Moses and the Ten

---

6. Justice O'Connor spoke of this tension between the language of the clause and our past conduct, recognizing other governmental "acknowledgements" of religion such as government declaration of Thanksgiving as a public holiday and the printing of "In God We Trust" on coins. *Lynch,* 465 U.S. at 692–93, 104 S.Ct. at 1369 (O'Connor, J., concurring).

7. The creche consisted of "the traditional figures, including the infant Jesus, Mary and Joseph, angels, shepherds, kings, and animals...." *Lynch,* 465 U.S. at 671, 104 S.Ct. at 1358. It is Jesus of Nazareth whom Christians believe to be the Messiah. *See Allegheny County,* 492 U.S. at 579 n. 1, 109 S.Ct. at 3093 n. 1 (citing 8 *Encyclopedia of Religion* 15, 18 (1987)).

Commandments in the U.S. Courthouse. *Id.* at 676–77, 104 S.Ct. at 1360–61.

The test for determining whether a governmental act violates the Establishment Clause of the First Amendment was first articulated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). In *Lemon* the Supreme Court announced a tripartite test for determining whether government action violates the Establishment Clause: "first, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; [and] finally, the statute must not foster 'an excessive government entanglement with religion.'" *Id.* at 612–13, 91 S.Ct. at 2111 (citations omitted). "State action violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).

Although the tripartite test established in *Lemon* has never been overruled,[8] the Supreme Court has since elaborated upon the second prong of the *Lemon* test—that the principal or primary effect of the government action must not be either to advance or inhibit religion. This elaboration had its beginnings in the concurrence of Justice O'Connor in *Lynch.* Justice O'Connor opined that whether a government's actions inappropriately advance or inhibit religion under the *Lemon* test depends upon whether these actions reasonably can be interpreted as governmental endorsement or disapproval of religion. *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, J., concurring). In order to make that determination, Justice O'Connor suggested that courts must consider (1) what message the government intended to convey; and (2) what message the government's actions actually conveyed to a reasonable person. *Id.* at 690, 104 S.Ct. at 1368. Justice O'Connor noted that "the meaning of a statement to its audience depends both on the intention of the speaker and on the 'objective' meaning of the statement in the community."

*Id.* Hence, as Justice O'Connor ultimately concluded, both the government's intended message and the message actually given must be secular in nature. *Id.*

■ Five years later, in *Allegheny County,* the Court embraced Justice O'Connor's refinement of the second prong of the tripartite *Lemon* test. As modified, the appropriate inquiry requires a determination as to whether the suspect government act has "the purpose or effect of 'endorsing' religion." *Allegheny County,* 492 U.S. at 592, 109 S.Ct. at 3100. Justice Blackmun, writing for a divided Court in *Allegheny County,* noted that Justice O'Connor's concurrence in *Lynch* "provides a sound analytical framework for evaluating governmental use of religious symbols," *id.* at 595, 109 S.Ct. at 3102, and "the government's use of religious symbolism is unconstitutional if it has the effect of endorsing religious beliefs, and the effect of the government's use of religious symbolism depends upon its context." *Id.* at 597, 109 S.Ct. at 3103.

The primary way in which courts have determined the effect of the government action is by focusing on the content of the display and the context in which the questioned object appears. For example, in *Allegheny County,* the Court examined two displays on public property in downtown Pittsburgh, one of a creche standing alone in a courthouse staircase and one of a menorah displayed as part of a larger winter holiday exhibit in front of the City–County building. The creche used words in its portrayal of the nativity scene—the angel in the creche said "Glory to God in the Highest!" *Id.* at 598, 109 S.Ct. at 3103. By contrast, the menorah was part of a winter holiday exhibit which included a sign with the words "Salute to Liberty" placed below a Christmas tree. The Court found that the creche display violated the Establishment Clause and the menorah display did not. *Id.* at 600, 109 S.Ct. at 3104–05.

---

8. Although there have been cases in which the Supreme Court has avoided using the *Lemon* test, *see, e.g., Lee v. Weisman,* — U.S. ——, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (question of whether religious organization could be denied the right to meet in school property after school hours was decided on Freedom of Speech grounds), the Supreme Court has declined the invitation to repudiate it.

In evaluating both the content and the context of the creche display, the Supreme Court noted that the creche sends an unmistakable religious message, praising God in Christian terms. The Court concluded that "nothing in the content of the display detracts from the creche's religious message." *Id.* at 598, 109 S.Ct. at 3103–04. The Court also noted the physical setting and location of the creche, concluding that it "stands alone; it is the single element of the display on the Grand Staircase." *Id.* The Court then pointed out that the Grand Staircase is "the 'main' and 'most beautiful part' of the building that is the seat of county government." *Id.* at 599, 109 S.Ct. at 3104. The Court concluded that "no viewer could reasonably think that it occupies this location without the support and approval of the government." *Id.* at 599–600, 109 S.Ct. at 3104.

The menorah display, on the other hand, was part of a holiday season display which saluted liberty; the Court found that the context of the entire display neutralized the religious dimension of the display. The Court conceded that the menorah is a religious symbol: it serves to commemorate the miracle of oil as described in the Talmud.[9] *Id.* at 613, 109 S.Ct. at 3111. The Court also noted, however, that the menorah is a symbol of a holiday that, like Christmas, has both religious and secular dimensions. *Id.* The Court held that since the menorah stood next to a Christmas tree and a sign saluting liberty, it created an "overall holiday setting." *Id.* at 614, 109 S.Ct. at 3112.

## B

Several courts have examined the content and context of Ten Commandments displays in evaluating their constitutionality. For example, in *Anderson v. Salt Lake City Corp.,* 475 F.2d 29 (5th Cir.1973), under circumstances similar to those present here, the Fifth Circuit Court of Appeals allowed a gift of the Order of Eagles to be displayed on the courthouse grounds. This gift was a granite monument[10] inscribed with the Ten Commandments and other religious and nonreligious symbols much like the monument in the case at bar. The court found that the gift was nothing more than a historically important monument with both secular and sectarian effects. The court held that the monument was being presented primarily for its historical significance and that it would be unreasonable to require removal of the monument simply because it reflected the religious nature of an ancient era. *Id.* at 34. *But see Harvey v. Cobb County, Ga.,* 811 F.Supp. 669, 678 (N.D.Ga.1993) (placement of Ten Commandments alone in alcove of the courthouse, high on the wall, with no countervailing secular passages or symbols, had effect of endorsing religion).

It has been where the display or publication of the Ten Commandments concerns public schools—where young and impressionable minds are in need of greater protection—that courts have been less tolerant of the potential to inappropriately persuade or coerce students by religious views. In *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), for example, vigilance to avoid and protect against coercion properly prevailed over a fear that the prohibition might be hostile to religion. In *Stone,* the United States Supreme Court invalidated a state statute requiring the posting of a copy of the Ten Commandments on public classroom walls. Each plaque bore a notation expressing the purpose was to demonstrate the secular application of the Ten Commandments as the fundamental legal code of western civilization and the common law of the United States. Despite that avowed purpose, the Court concluded the statute served no secular legislative purpose and was therefore unconstitutional. The Court found that "the pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plain-

---

9. The Talmud, an "all-embracing constitution of medieval Jewish life," is an extended, multivolume compilation of rabbinic teachings, including law, morality, and theology. The Hebrew word *talmud* means "study." The original writings, which were substantially supplemented over time, were "completed" by the middle of the fifth century. *See* 14 *Encyclopedia of Religion* 256–57 (1987).

10. We do not accept the *Anderson* court's use of the term "monolith" in reference to the Ten Commandments monument. *See infra,* p. 1024 n. 16.

ly religious in nature," *id.* at 41, 101 S.Ct. at 194, noting that the commandments were not "integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Id.* at 42, 101 S.Ct. at 194; *see also Ring v. Grand Forks Pub. Sch. Dist. No. 1*, 483 F.Supp. 272, 274 (D.N.D.1980) (The purpose is to "display the Ten Commandments of the Christian religion in a conspicuous place in all classrooms. There is not even a pretense of a secular purpose in the statute or in the defendants' compliance with the statute.").

The differences between the *Anderson* monument and the *Stone* and *Ring* displays are significant and make reliance on cases involving the publication of the Ten Commandments in classrooms misplaced. The monuments in *Stone* and *Ring* were placards containing the Ten Commandments of the Christian religion, meant to be placed in a conspicuous place in all classrooms, where students' attendance is mandatory and frequent, as a means of instilling in students certain values. *Stone*, 449 U.S. at 42, 101 S.Ct. at 194; *Ring*, 483 F.Supp. at 274. School religion cases require a more stringent analysis because of the age of the minds affected, and because students are captive audiences, especially susceptible to influence. In *Anderson*, however, the monument presented was not associated with any one particular religion, and was not displayed in a location meant to influence the thinking of young children. Rather, the monument was presented primarily for its historical significance. *Anderson*, 475 F.2d at 34.[11] Thus, the analysis applied by the *Anderson* court is more relevant to this case.

Despite the undeniably religious nature of the Ten Commandments,[12] federal courts

have generally concluded that if there are countervailing secular passages or symbols in the content of the display or if the context of the display detracts from its religious message, then the display may be constitutional. *See, e.g., Anderson*, 475 F.2d 29; *Harvey*, 811 F.Supp. at 677–78; *see generally Lynch*, 465 U.S. at 683, 104 S.Ct. at 1364.

## V

■ Following the principles set forth in the *Conrad* cases, and the legal standard set forth in *Lemon* as modified by the United States Supreme Court in *Allegheny County*,[13] the constitutionality of the Ten Commandments monument in this case will depend upon whether the display has the purpose or effect of endorsing or disapproving of religion. Resolution of that issue will rest in large part on the particular content and physical setting of the monument. *See Allegheny County*, 492 U.S. at 595, 109 S.Ct. at 3102.

## A

Upon consideration of the content of the monument itself, we conclude that it was not erected with the purpose of endorsing religion. The monument at issue here does not reproduce exactly the Ten Commandments as accepted by any particular sect. The text includes symbols of at least two significant religions, Judaism and Christianity,[14] whose teachings are in substantial conflict with each other. We find that the juxtaposition of the Christian Chi and Rho with the Jewish Star of David reflects an acknowledgement of reconciliation and diversity more than any sentiment of intolerance. Between the two tablets is an "all-seeing eye" which has both

---

**11.** In addition, the *Stone* case involved a legislative act, whereas the *Anderson* case, as here, involved only a single state action.

**12.** *See, e.g., Stone*, 449 U.S. at 41–42, 101 S.Ct. at 193–94 ("The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. Rather, the first part of the Commandments concerns the religious duties of believers: worshiping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the

Sabbath Day."); *Harvey*, 811 F.Supp. at 677 ("The Ten Commandments are an integral part of the Jewish and Christian traditions, appearing in the book of Exodus in the Bible or Old Testament.").

**13.** *Conrad I* was decided prior to the Supreme Court's decisions in *Lynch* and *Allegheny County*.

**14.** For purposes of this discussion, we deem it unnecessary to distinguish between the several Christian faiths or denominations.

secular and nonsecular meanings.[15] Dr. Clarence Snelling, Jr. testified that the "eternal eye" contains the pyramid, which is a symbol from Egypt itself, indicating that "it has a different genesis than the three religions that use the Ten Commandments." The monument also has patriotic symbols in the form of an eagle and the flag.

Furthermore, the content of the monument is consistent with the stated secular purpose of the donation. The monument was donated as part of the National Youth Guidance Program, whose purpose was secular in nature.[16] Such secular intent of the donation is logical in light of the historical fact that the Ten Commandments has served over time as a basis for our national law. All the experts who testified at trial agreed that, at least to the extent that the Commandments established ethical or moral principles, they were expressions of universal standards of behavior common to all western societies. It was agreed that these moral standards, as influenced by the Judeo–Christian tradition, have played a large role in the development of the common law and have formed a part of the moral background for the adoption of the national constitution.[17] While a statement

disclaiming any religious purpose perhaps would have provided greater evidence of no intention to promote religion, the existence of such a statement or its absence alone is not determinative.

■ Finally, the record contains no direct evidence of the State's purpose in accepting the monument because, as found by the trial court, the State has no record of how the monument came to be in Lincoln Park. The record does reflect, however, through the testimony of several state employees, that the State's purpose in accepting any monuments in that park is not to endorse the message depicted in the various monuments, but rather to open the public park up to all different types of groups interested in utilizing the valuable state grounds. Given the State's generally neutral objective in accepting monuments, and absent evidence to the contrary, we presume that the donative intent is also the basis of acceptance. We ascribe to the donee the intent of the donor—that is, acceptance of the gift by the State, without other evidence, indicates the State's assent to the Eagles' stated secular purpose.

**15.** The expert witnesses agreed that the "all-seeing eye" is most commonly used as a secular symbol, giving its use on the one-dollar bill as an example.

**16.** E.J. Ruegemer, the Minnesota juvenile court judge who conceived of this idea, submitted an affidavit which was accepted into evidence, stating that posting the Ten Commandments was "not to be a religious instruction of any kind," but rather was meant to "show these youngsters that there were such recognized codes of behavior to guide and help them." Judge Ruegemer's statements are consistent with an exhibit admitted during the trial that contained a short article in the July, 1955, edition of the *Denver Eagle*, a publication of the Eagles, announcing the donation of the Ten Commandments monument to the State of Colorado. The article reads in its entirety as follows:

> The Colorado Eagles will donate a monolith to the State containing the ten commandments, to be placed on the Capitol grounds in the next few months. A part of the National Youth Guidance Program, the large marble piece was approved at the Lamar State Convention.

We find the conspicuous absence of any reference to religion by the Eagles and the Eagles' original hesitance to provide the gift out of fear that the organization might be viewed as endors-

ing religion to be important and consistent with a conclusion that it was given with secular purpose. Finally, we note that if there is any discrepancy in the article or any exaggeration, it is the reference to the monument as a "monolith" and as a *"large* marble piece." (Emphasis added.) Webster's defines "monolith" as "a single great stone often in the form of an obelisk or column" or something "usually having tremendous size or strength." *Webster's Third New International Dictionary* 1462 (1986). Standing three to four feet high and two and one-half feet wide, we find the monument is not a "monolith," is not "large" and that, by its setting, is not even a prominent feature of Lincoln Park.

**17.** For example, Gregory Robbins, a theology expert witness for the State, testified that:

> even though there are elements of this monument that are overtly religious, the monument can also be seen to harken back to those moral languages, those two streams that developed our sense of law, and that it is possible to construe this monument as being a monument to the fact that we as a republic are a people who pay attention to law.... I think it is possible to construe [commandments] two through ten as being examples of law that this country has observed from its very beginning.

### B

■ The message the object conveys in context is also significant in a determination of whether the display has the effect of endorsing religion, because the context may affect the message a reasonable observer would derive from the setting. As the trial court found, the Ten Commandments monument in this case does not stand alone and is not a conspicuous feature of Lincoln Park. In the immediate vicinity of the Ten Commandments monument are both the much larger Martinez Statue and the larger drinking fountain monument; secular monuments similar to those are also found throughout the Capitol Complex Grounds. In fact, the Ten Commandments monument is one of the smallest and least conspicuous of the displays in Lincoln Park. Furthermore, it is not displayed in the central or most prominent part of the park, which is reserved for two tributes to veterans, the Veterans Memorial and the flag monument. In essence, the monument is found in what is much like a museum setting which, "though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content." *Lynch*, 465 U.S. at 692, 104 S.Ct. at 1369.

The various monuments found around the park in fact represent a cornucopia of different cultural events and experiences that make up the history of our nation and reflect upon a history that is also Colorado. For example, the J.P. Martinez statue is in tribute to a Hispanic medal of honor recipient and commemorates the military service of Colorado citizens of Hispanic descent; the metal flagpole is dedicated to all citizens killed in the Spanish–American War; and the metal reproduction of the Liberty Bell celebrates the freedom upon which this country was founded. This collection of monuments celebrates a history of standing up against oppression, foreign and domestic, and an acknowledgement of the cultural tapestry that is Colorado.[18]

Although displayed on public property, unlike the school setting cases, the monument is not located so as to have a coercive effect. In fact, unlike in *Anderson*, where citizens exercising their right to access the courts or other government benefits might encounter the monument upheld there, here the monument occupies an inconspicuous place where citizens may be found by choice and are not necessarily present for purposes related to government. While the text of the Ten Commandments affixed to a monument would not be appropriately placed on state property *standing alone*, here the Ten Commandments monument and its countervailing secular text fits within the melange of historical commemorative accounts found in Lincoln Park.[19] Furthermore, the display of monuments in Lincoln Park teaches a history of rich cultural diversity—due to our past it would be inaccurate to ignore a history that includes religion.

### C

Accordingly, we find that the content and context of the monument negate any suggestion that the government is endorsing religion. We conclude on the record before us that objective viewers would not perceive the monument in its Lincoln Park setting as

18. We note here that, within limits that do not send a message that government is hostile towards any identifiable group or that any members of any group are not fully accepted members of our community, the State has a vital interest in preserving and protecting different religious, cultural and ethnic backgrounds and traditions.

19. As stated in the testimony of Gregory Robbins: [I]n religious studies we are very much concerned about things that create sacred space. And that architecture has ways of telling you that this is holy ground, this is sacred space, this is a religious zone, if you will. So, for example, if you enter into a cathedral, the Basilica of the Immaculate Conception, you have holy water, you have multiple symbols that tell you that you have passed from a secular zone, Colfax Avenue, to a sacred zone, to a holy space.

This monument, in the context of the state capitol, which is not supported by other sacred symbols for either the Jewish or the Christian tradition, surrounded as it is by other sorts of memorials, the Vietnam memorial, the cannons, as well as other buildings, there is nothing about this monument that establishes the place around it or the monument as sacred space. There simply is not the supporting symbols, the supporting architectural configuration that would suggest that.

government endorsing religious belief or suggesting that religion in general is relevant to their standing in the political community.

## VI

Establishment Clause cases require highly fact specific scrutiny which must be approached on a case-by-case basis. In *Conrad I* we recognized that analysis of a Preference Clause challenge to governmental action "is dependent in important part on factual determinations." *Conrad I*, 656 P.2d at 667. The controlling question in this case is what a reasonable observer might fairly understand to be the primary message of the monument, as displayed in its particular setting. We find that, considering the monument and its placement in the park as well as the proximity of other monuments, the Ten Commandments monument is not isolated and, as displayed in Lincoln Park, does not convey a primarily religious message.

The determination of whether the monument has the purpose or effect of endorsing religion also involves questions of law. In its review, the trial court did not apply the *Lemon* test as set forth in *Allegheny County;* however, after applying that test to the undisputed evidence and the findings set forth by the trial court, we find that the trial court reached the correct result.

 We believe it would result in the very callous indifference suggested by Justice Douglas in *Zorach* to exaggerate the effect of benign religious messages by suggesting they automatically inculcate religion. The flaw of such a result would be to assume improper motive and to credit inappropriate religious involvement by the State in every message of historical or solemn significance in which religious precepts may also be attributed to the words and symbols used. Under our Establishment and Preference Clause jurisprudence, any religious meaning

of legal consequence must ultimately flow from the character of the state action as perceived by an objective observer, but does not turn on whether the message, though secular, also has religious value. We conclude that applying the objective observer test under the particular circumstances before us today, such a predominant religious character is not intuitively obvious. Nonetheless, while we are to be vigilant to bar state conduct that results in the establishment of religion, we are not to engage in an exercise intended to require government to prefer non-believers over believers.

Judicial review of Establishment and Preference Clause cases does not begin and end with a determination that the offending conduct includes a message of religious value. If that were the case, the result in *Conrad I* and *Conrad II* could not stand in the face of an inquiry designed to determine whether the creche, standing alone, sends a religious message. Moreover, if such an examination were the standard by which to apply our First Amendment jurisprudence, then Congressional prayer, the cry of the Clerk of the Supreme Court,[20] and setting aside secular holidays such as Thanksgiving or Christmas could not withstand scrutiny.[21]

## VII

Accordingly, applying the legal standard set forth in *Lemon* as modified by *Allegheny County*, we find that the preeminent purpose of erecting the monument was not plainly religious in nature—rather, the monument represents the secular objective intended at the outset, recognition of a historical, jurisprudential cornerstone of American legal significance. Moreover, the content and context of the display do not convey a message that any person is excluded from our political community based on religious beliefs or the lack of such beliefs.[22] Thus, we conclude

**20.** Upon opening each session of the United States Supreme Court, the Clerk announces, "God save the United States and this Honorable Court."

**21.** Because of their "history and ubiquity," such government acknowledgements of religion are not understood as conveying government approval of particular religious beliefs. *See Lynch,* 465

U.S. at 693, 104 S.Ct. at 1369–70 (O'Connor, J., concurring).

**22.** We do not question the motives of the respondents, and in no way do we doubt the sincerity and strength of their convictions. We note only that the test to be applied is not a subjective one. As the United States Supreme Court stated in *Lynch,* 465 U.S. at 690, 104 S.Ct. at 1368: "The

that the Ten Commandments monument does not have the purpose or effect of endorsing religion, nor does it suggest the State's disapproval of any religious or non-religious choices protected by our Federal and State Constitutions. For the foregoing reasons, we reverse the judgment of the court of appeals.

ERICKSON, LOHR and KIRSHBAUM, JJ., dissent.

Justice ERICKSON dissenting:

In my view, a new trial is necessary because the First Amendment Establishment Clause tests announced in this opinion by the majority for the first time were not followed by the trial court. I agree with Justice Lohr's analysis of the First Amendment and would join his dissent if he required that a new trial be granted. I agree with Justice Kirshbaum's conclusion in his dissent that a new trial is required to properly determine the issues in accordance with the First Amendment standards set in this case.

Justice LOHR, dissenting:

We granted certiorari to review the Colorado Court of Appeals' decision in *Freedom From Religion Foundation, Inc. v. State of Colorado,* 872 P.2d 1256 (Colo.App.1993), reversing the trial court and holding that the Ten Commandments monument located in Lincoln Park near the State Capitol violated the Establishment Clause of the First Amendment to the United States Constitution and the Preference Clause of the Colorado Constitution.[1] The majority in turn reverses the court of appeals and finds the monument constitutional. To do so, the majority must define the applicable constitution-

al standard. It states that the proper constitutional inquiry is whether the monument "communicates a prohibited endorsement or disapproval of religion." Maj. op. at 1018. In addition, to be constitutional, the monument may not send a message to individuals that religion is relevant to their standing in the political community. Maj. op. at 1019–20, 1025–26. To interpret the monument's message, the majority focuses on the content of the Ten Commandments monument and the context in which the monument appears. *See* maj. op. at 1021–22. The majority concludes that the Ten Commandments monument does not send a message of government endorsement of religion. Maj. op. at 1025–26. Rather, according to the majority, the Ten Commandments monument is simply commemorative of the history and cultural diversity of Colorado.[2] *See* maj. op. at 1025. Thus, the majority holds that despite the religious content of the Ten Commandments monument, the monument is constitutional.

I agree with the majority that the proper inquiry is whether a governmental display of religious objects conveys a message of governmental endorsement of religion or communicates to individuals that religion is relevant to their standing in the political community. In addition, I agree that the context in which the monument appears is a central factor in the analysis of this question. However, I disagree with the majority's application of the "endorsement" test and its conclusion that the other monuments in Lincoln Park neutralize the inherently religious nature of the Ten Commandments monument. Therefore, I respectfully dissent.

I.

I adopt the majority's rendition of the relevant facts in section II of the opinion. I

meaning of a statement to its audience depends both on the intention of the speaker and on the 'objective' meaning of the statement in the community." In this case the evidence points to the secular intent of the speaker and the objectively viewed secular message conveyed. As stated more recently by the Supreme Court while striking down certain state conduct implicating religion under the Free Speech Clause of the First Amendment, "[w]e do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive." *Lee,* — U.S. at ——, 112 S.Ct. at 2661.

1. U.S. Const. amend. I; Colo. Const. art. II, § 4.

2. In addition, the majority holds that the State of Colorado did not place the Ten Commandments monument on the grounds of the State Capitol with the intent to endorse religious beliefs. Maj. op. at 1024–25. As I do not dispute the majority's conclusion and because the government's stated purpose for erecting the monument does not have any bearing on the inquiry into the objective message the monument may communicate to an observer, this dissent does not address the issue. *See infra* p. 1037–38 and n. 2.

set forth independently, however, the pertinent federal case law regarding freedom of religion issues.[3]

### A.

The Establishment Clause of the First Amendment of the United States Constitution provides, "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. This clause is applicable to the states through the Fourteenth Amendment. *See* U.S. Const. amend. XIV and *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The United States Supreme Court has interpreted the Establishment Clause to mean that government may not promote or affiliate itself with any religious doctrine or organization. *Allegheny County v. American Civil Liberties Union,* 492 U.S. 573, 590, 109 S.Ct. 3086, 3099, 106 L.Ed.2d 472 (1989). Government may not officially prefer one religious creed or denomination over another. *Id.* at 605, 109 S.Ct. at 3106; *Wallace v. Jaffree,* 472 U.S. 38, 70, 105 S.Ct. 2479, 2497, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring). Nor may government favor religion over nonreligion. *Allegheny County,* 492 U.S. at 593, 109 S.Ct. at 3100–01; *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 27–28, 109 S.Ct. 890, 906–07, 103 L.Ed.2d 1 (1989) (Blackmun, J., concurring) ("government may not favor religious belief over disbelief" or adopt a "preference for dissemination of religious ideas");

*Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 305, 83 S.Ct. 1560, 1615, 10 L.Ed.2d 844 (1963) (Goldberg, J., concurring) ("The fullest realization of true religious liberty requires that government ... effect no favoritism among sects or between religion and nonreligion").

As the majority notes, these principles do not require complete separation of church and state where governmental isolation would unnecessarily burden or hinder an individual's ability to worship freely. *See* maj. op. at 1020. For example, in *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), the Supreme Court upheld a public school policy, established pursuant to statute and regulation, that released students from school so that they could attend religious instruction classes away from school property. The Court reasoned that the school was merely accommodating the needs of those seeking religious instruction rather than encouraging or compelling students to participate. *Zorach,* 343 U.S. at 311, 72 S.Ct. at 682–83. The Court held that the First Amendment permitted accommodation of the students' religious needs.[4] *Id.* at 314, 72 S.Ct. at 684. Thus, the First Amendment allows government to accommodate the religious nature of its people as long as its actions neither interfere with the free exercise of religion nor impermissibly establish religion.[5]

---

**3.** The Preference Clause of the Colorado Constitution is considerably more specific than the Establishment Clause of the United States Constitution. *Americans United for Separation of Church and State Fund, Inc. v. State,* 648 P.2d 1072, 1081 (Colo.1982); *see also* maj. op. at 1019. However, we have recognized that the Preference Clause and the Establishment Clause embody the same values of free exercise and government noninvolvement in religious issues. *Americans United,* 648 P.2d at 1081. Thus, we have looked to the body of federal case law interpreting the First Amendment to the United States Constitution for guidance when considering Preference Clause issues. *Conrad v. City and County of Denver,* 656 P.2d 662, 670–71 (Colo. 1983). For purposes of resolving this case, I do not find it necessary to consider the Preference Clause apart from Establishment Clause jurisprudence.

**4.** In *Illinois ex rel. McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), the Supreme Court invalidated a school

policy that freed public school students from some hours of required school work on condition that they attend religious classes within the school building. In *Zorach,* the court distinguished *McCollum* by stating:

> In the *McCollum* case the classrooms were used for religious instruction and the force of the public school was used to promote that instruction. Here, as we have said, the public schools do no more than accommodate their schedules to a program of outside religious instruction.

*Zorach,* 343 U.S. at 315, 72 S.Ct. at 684.

**5.** While the First Amendment allows government to accommodate religious beliefs, it does not require accommodation in all circumstances. The Supreme Court of the United States has held that although the First Amendment allows government to enact religious practice exemptions to religiously neutral laws of general applicability, it does not compel governments to do so.

Accommodation, however, does not justify placement of religious objects on government ground. *Allegheny County,* 492 U.S. at 601 n. 51, 109 S.Ct. at 3105 n. 51. Denying a particular sect placement of their religious objects on government ground does not burden the ability to worship. It may deprive the members of a particular sect of the benefit of seeing government adopt the sect's religious message as its own. This, however, is precisely what the Establishment Clause prohibits. *Id.* Government does not demonstrate callous indifference to religion by abstaining from endorsing particular religious objects or ideas. On the contrary, by remaining neutral with respect to the religious beliefs of its people, government ensures that all individuals may worship freely or not at all.

### B.

The Supreme Court of the United States articulated the test for determining whether a statute violates the Establishment Clause in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The Supreme Court stated:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, finally, the statute must not foster "an excessive government entanglement with religion."

*Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111 (citations omitted). This test has since been utilized to evaluate governmental actions as well as statutes.[6] *See, e.g., Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). Failure to satisfy any one of these three prongs results in a violation of the Establishment Clause. *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987); *Stone v. Graham,* 449 U.S. 39, 40–41, 101 S.Ct. 192, 193–94, 66 L.Ed.2d 199 (1980) (per curiam).

The Supreme Court's decisions since *Lemon* have further delineated the scope of the "effect prong" of the *Lemon* test. *Lynch,* 465 U.S. at 689, 104 S.Ct. at 1367 (O'Connor, J., concurring) ("[f]ocusing on ... endorsement or disapproval of religion clarifies the *Lemon* test as an analytical device"). The Court has scrutinized governmental practices vigilantly to determine whether they have the primary purpose or effect of "endorsing religion," thereby contravening the First Amendment. *Allegheny County,* 492 U.S. at 593, 109 S.Ct. at 3100–01; *Witters v. Washington Dept. of Services for the Blind,* 474 U.S. 481, 489, 106 S.Ct. 748, 752–53, 88 L.Ed.2d 846 (1986) (holding that extending assistance under a state vocational rehabilitation program to a blind person attending a religious institution did not convey any message of state endorsement of religion and was not unconstitutional); *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 391, 105 S.Ct. 3216, 3226–27, 87 L.Ed.2d 267 (1984) (holding that close identification between government powers and responsibilities and those of any religion conveys a message of endorsement that violates a core tenet of the Establishment Clause); *see generally* Laurence H. Tribe, *American Constitutional Law* 1224 (2d ed. 1988) (describing meaning and use of the endorsement test).

Impermissible endorsement of religion includes government promotion of one religious belief system over another. *Edwards,* 482 U.S. at 593, 107 S.Ct. at 2582–83. In addition, under the endorsement test, it is uncon-

---

*Employment Division v. Smith,* 494 U.S. 872, 890, 110 S.Ct. 1595, 1606, 108 L.Ed.2d 876 (1990) (government not required to enact religious use exemption to general criminal law banning use of peyote). Governments may require individuals to comply with neutral laws of general application even if the laws conflict with the individual's sincerely held religious beliefs. *Id.* at 879–82, 110 S.Ct. at 1600–02; *see, e.g., United States v. Lee,* 455 U.S. 252, 258–61, 102 S.Ct. 1051, 1055–57, 71 L.Ed.2d 127 (1982) (Amish employer not exempt from paying social security taxes on ground that Amish faith prohibited participation in governmental support programs).

**6.** The Supreme Court has not used the *Lemon* test exclusively when evaluating and deciding Establishment Clause cases. Maj. op. at 1021 n. 8; *see, e.g., Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). However, as the majority notes, the Supreme Court has not repudiated the use of the *Lemon* test. *Id.* At present, the *Lemon* test remains both a useful analytical tool for evaluating the constitutionality of public displays and a central tenet of Establishment Clause jurisprudence.

stitutional for the state, through its actions, to make adherence to religion relevant in any way to a person's standing in the political community. *Allegheny County*, 492 U.S. at 594, 109 S.Ct. at 3101–02; *Lynch*, 465 U.S. at 687, 104 S.Ct. at 1366–67 (O'Connor, J., concurring). Endorsement "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch*, 465 U.S. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring).

In evaluating governmental displays of religious objects, the primary question is what "viewers may fairly understand to be the purpose of the display." [7] *Allegheny County*, 492 U.S. at 595, 109 S.Ct. at 3102 (opinion of Blackmun, J.); *Lynch*, 465 U.S. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring). This inquiry is shaped by consideration of the religious object itself, as well as of the context in which the object appears. *Allegheny County*, 492 U.S. at 595, 109 S.Ct. at 3102 (opinion of Blackmun, J.). Context is significant because it may affect the message a reasonable observer would derive from the scene. *See id.* Thus, context could negate any suggestion that government is endorsing religious beliefs or particular religious choices.

### C.

In summary, when evaluating state-sponsored displays of religious objects, a court must determine whether the display has the purpose or effect of endorsing religion. When making this determination, the court first must consider the object itself. Second, the court must consider whether the context

in which the object appears changes or alters the object's message. Finally the court must determine whether a reasonable observer would perceive the object in context as endorsing religious belief or suggesting that religion in general is relevant to the observer's standing in the political community.

### II.

### A.

The Ten Commandments monument is an inherently religious symbol that has the primary effect of endorsing religion. The prominence of the religious message is best understood by viewing the picture of the monument itself, attached as an appendix to this opinion. The text dominates the monument. The words "I AM the LORD thy God" are written at the top of the text and in larger letters than the commandments themselves. *See* maj. op. at 1016 and appendix. In addition, the first three commandments instruct followers to "have no other gods before me," to "not take the name of the Lord thy God in vain," and to "[r]emember the Sabbath day to keep it holy." *Id.* These commandments are primarily religious in nature and a foundation of Judeo–Christian theology. In *Stone*, the United States Supreme Court described the inherently religious nature of the Ten Commandments:

> The Ten Commandments are *undeniably a sacred text* in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters.... Rather, the *first part of the Commandments concerns the religious duties of believers:* worshipping the Lord

---

**7.** As the majority explains, the inquiry regarding the effect prong of the *Lemon* test is completely separate from that of the purpose prong. *See* maj. op. at 1021. Under the purpose prong, courts consider what message the government intended to convey. Under the effect prong, courts must consider the message actually conveyed to a reasonable person. It is necessary to consider the objective message because some viewers may not have access to evidence of intent. *Lynch*, 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring). For these viewers, the message actually conveyed may be something not actually intended. *Id.* Therefore, courts when determining the constitutionality of governmental displays of religious objects must consider the objective meaning of the display wholly apart from the government's purpose for erecting the display. (Thus, in this case, the fact that both the Fraternal Order of Eagles and the Colorado State Government had a secular purpose in erecting the Ten Commandments monument should not affect consideration of the effect of the monument's objective message. *See* maj. op. at 1023–25.).

God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day.

449 U.S. 39, 41–42, 101 S.Ct. at 194 (1980) (citations and footnote omitted and emphasis added).[8] Given the irrefutably sacred meaning of the text of the monument, a reasonable observer would consider display of this text to be an endorsement of religion.[9]

In addition to the commandments themselves, the monument has the religious symbols of a Chi Rho, the Latin symbol for Christ, and two Jewish Stars of David engraved upon it. These symbols further enhance the monument's endorsement of religion. That these symbols represent both Christianity and Judaism does not neutralize the monument's message of endorsement. As Justice Blackmun noted in *Allegheny County,* the "simultaneous endorsement of Judaism and Christianity is no less constitutionally infirm than the endorsement of Christianity alone." 492 U.S. at 615, 109 S.Ct. at 3112. Representation of multiple religious sects accentuates rather than ameliorates the overall religious message of the monument.[10] Because it is unconstitutional for government to favor religion over nonreligion, it is not necessary to find that the monument advances a particular religion in order to find the monument unconstitutional.

Although the monument has secular symbols on it, most prominently an American flag and an eagle, these symbols do not detract from the overall religious message of the monument. On the contrary, the juxtaposition of these uniquely American symbols

with the religious content of the text and the religious symbolism on the monument serves to enhance the message of endorsement. By invoking reference to the United States government, these symbols send a message to non-adherents of the western religions represented that they do not enjoy full standing in the political community. This is exactly what the First Amendment prohibits.

### B.

Given the inherently religious nature of the Ten Commandments monument itself, I next consider whether the context of Lincoln Park neutralizes the monument's message of endorsement. As the majority explains, Lincoln Park and the greater capitol grounds contain a wide variety of memorials, statues, and monuments. *See* maj. op. at 1015–16. Located in the immediate vicinity of the Ten Commandments monument is a statue of J.P. Martinez commemorating the participation of Coloradans of Hispanic descent in war, and a drinking fountain monument.[11] The tall Veterans War Memorial is near the center of the park, and a replica of the Liberty Bell is located across the park from the Ten Commandments monument. Other monuments are situated at various locations in the park. *See* maj. op. at 1015.

The majority holds that these monuments create a "museum setting" which negates any message of endorsement. Maj. op. at 1025. These monuments, however, commemorate a diverse array of events and individuals. There is little thematic connection between

---

8. The Supreme Court in *Stone* evaluated the constitutionality of a statute requiring the posting of a copy of the Ten Commandments on the wall of each public elementary and secondary school classroom. The Court held that the statute was unconstitutional because the posting had no secular purpose, notwithstanding the legislative requirement that each display contain a notation that "[t]he secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Stone,* 449 U.S. at 39–40 n. 1, 101 S.Ct. at 193 n. 1 (quoting Ky.Rev.Stat. § 158.178 (1980)).

9. The majority agrees with the conclusion that *"standing alone,"* display of the text of the Ten Commandments would be unconstitutional.

Maj. op. at 1025 (emphasis in original). Thus, the majority finds the Ten Commandments monument constitutionally acceptable only because it concludes that the secular material on the monument taken together with the other monuments within Lincoln Park neutralize the religious import of the Ten Commandments monument.

10. Likewise, the fact that the monument does not reproduce the Ten Commandments as accepted by any particular sect does not lessen the monument's message of endorsement of religion over nonreligion.

11. The drinking fountain monument is dedicated to the memory of Sadie M. Likens who aided war survivors in the early part of this century. *See* maj. op. at 1016.

them and the Ten Commandments monument. While the other monuments commemorate actual historical events in American history, the Ten Commandments monument does not.[12] Moreover, the monuments are displayed independently and do not create a cohesive unit. Thus, an observer would have little indication that the meaning of the Ten Commandments monument is related to the meaning of the other monuments in Lincoln Park. Likewise, the state has not accompanied the Ten Commandments monument display with a statement of purpose explaining the intended message of the monument as it relates to the other monuments within Lincoln Park.[13] Because the other monuments neither relate to nor secularize the meaning of the Ten Commandments monument, a reasonable observer would not understand the undeniably religious message of the Ten Commandments monument to be neutralized by the monument's setting.

The majority suggests that the collection of monuments within Lincoln Park "celebrates a history of standing up against oppression, foreign and domestic, and an acknowledgment of the cultural tapestry that is Colorado." Maj. op. at 1025. However, the Ten Commandments monument does not represent the fight against oppression and is not related to commemoration of our nation's involvement in various wars. In addition, a diverse group of peoples and religions—not limited to the persons of the Christian and Jewish faiths—have contributed to the "cultural tapestry that is Colorado." It is unclear how a reasonable viewer would understand a monument surrounded by war memorials and representing only Judaism and Christianity to be a commemoration of Colorado's cultural history.[14]

As further support for its conclusion that the religious message of the Ten Commandments monument is neutralized by context, the majority notes the monument's small size and inconspicuousness in relation to the other monuments in Lincoln Park. See maj. op. at 1024–25. It would seem the majority is intimating that government may endorse religion if the message is conveyed in a modest or inconspicuous way. I disagree.

Size may be a factor when evaluating the meaning of a display. In *Allegheny County,* the city displayed a forty-five foot Christmas tree next to an eighteen foot menorah during the winter holiday season.[15] 492 U.S. at 587, 109 S.Ct. at 3097–98. The Supreme Court determined that because the Christmas tree, a secular symbol representing Christmas, was the predominant element in the display, viewers would consider the entire display to be a secular celebration of the holiday season. *Id.* at 617, 109 S.Ct. at 3113. Size was relevant to the determination of the predominant message of the Christmas tree/menorah display. Thus, size may determine the primary meaning of the display when secular and religious messages are juxtaposed.

12. The majority states, "[T]he Ten Commandments monument and its countervailing secular text fits within the melange of historical commemorative accounts found in Lincoln Park." Maj. op. at 1025. It is unclear from the majority opinion what secular historic event the Ten Commandments monument is celebrating. To the extent the Ten Commandments represent the belief of Jews and Christians that God provided humans with a moral code by which to live, the monument is endorsing and extolling a particular religious belief and perspective. This is unconstitutional.

13. Where the secular meaning of a display is clear to a reasonable viewer, it may not be necessary for government to provide an explanation for the display's existence. However, where the religious meaning of a display is paramount, an explanation of meaning or purpose may neutralize any message of endorsement. *But see Stone,* discussed *supra* at n. 8.

14. I do not deny that the Ten Commandments could symbolically represent the origin of law within our culture. *See* maj. op. at 1024. Perhaps one could ascribe a secular cultural meaning to all religious objects in that religion is as much a cultural and social phenomenon as a sacred one. The constitutional issue, however, is not whether an objective viewer could derive any secular meaning from viewing the Ten Commandments monument. Rather, the question is what primary message is conveyed by the monument. The majority has not persuaded me that the secular messages it associates with the Ten Commandments monument are the primary ones that a reasonable observer would derive.

15. The display also included a sign saluting liberty.

However, size does not determine an object's constitutionality. A small object standing alone that has the primary effect of endorsing religion would be unconstitutional. A small encroachment upon our First Amendment values cannot be tolerated. As eloquently stated by Justice Clark, "The breach of neutrality that is today a trickling stream may all too soon become a raging torrent...." *Abington*, 374 U.S. at 225, 83 S.Ct. at 1573. Thus, because I have concluded that an objective viewer would not consider the Ten Commandments to be connected to the other monuments within Lincoln Park, the relatively small size and inconspicuousness of the Ten Commandments monument in relation to the other monuments in the park is of little significance.

The majority further suggests that because the Ten Commandments monument does not have a coercive effect on those viewing the monument, the monument is constitutional. *See* maj. op. at 1025. This statement misconstrues the endorsement test. The relevant constitutional inquiry is not whether a governmental display of religious objects coerces the citizenry to take part in religious activity. Rather, the issue is whether the display endorses religion or makes religion relevant to an individual's standing in the political community. While undoubtedly a display exhibiting a coercive effect would be unconstitutional, the endorsement test does not require coercion as a condition to a determination of unconstitutionality. *See, e.g., Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 786, 93 S.Ct. 2955, 2972, 37 L.Ed.2d 948 (1973) ("[W]hile proof of coercion might provide a basis for a claim under the Free Exercise Clause, it [is] not a necessary element of any claim under the Establishment Clause").

The United States Supreme Court specifically repudiated an Establishment Clause standard that prohibits only coercive practices or overt efforts at proselytization. *Allegheny County*, 492 U.S. at 609, 109 S.Ct. at 3109. The Court rejected this test as inconsistent with its long practice of applying strict scrutiny to practices suggesting a denominational preference. *Id.* at 608–09, 109

S.Ct. at 3108–09. The purpose of the Establishment Clause is to protect the religious liberty and respect the "religious diversity of the members of our pluralistic political community." *Id.* at 628, 109 S.Ct. at 3119 (O'Connor, J., concurring). Proscribing only coercive practices would fail to take account of the many more subtle ways "government can show favoritism to particular beliefs or convey a message of disapproval to others." *Id.* at 627–28, 109 S.Ct. at 3119. Thus, to the extent the majority contends that the Ten Commandments monument is constitutional because the monument does not have a coercive effect, the majority is incorrect.

### C.

In conclusion, the Ten Commandments monument represents particular religious beliefs and is an inherently religious object. Standing alone, the monument conveys governmental endorsement of religion over nonreligion. Furthermore, the other monuments within Lincoln Park do not neutralize this endorsement effect. A reasonable observer would not consider the primary meaning of the Ten Commandments monument to be one that commemorates cultural diversity within Colorado or the adoption of law within the United States. Rather, the monument primarily celebrates adherence to particular religious beliefs common to Judaism and Christianity. Because I conclude that this message impermissibly endorses religion by sending a message to non-believers and to adherents of other religious faiths that they are less favored members of the political community, I would hold the Ten Commandments monument unconstitutional.

This conclusion does not prefer the interests of non-believers over those of believers. *See* maj. op. at 1026. As Justice Blackmun wrote for the court in *Allegheny County*, "A secular state, it must be remembered, is not the same as an atheistic or antireligious state. A secular state establishes neither atheism nor religion as its official creed." 492 U.S. at 610, 109 S.Ct. at 3110. A monument professing atheistic values or encouraging the public to renounce their private religious beliefs would be as unconstitutional as the Ten Commandments monument at issue

in this case. Governmental silence with regard to religious beliefs ensures that neither believers nor non-believers are favored. In this way, religion is relegated to the realm of private conscience so that all individuals may worship or not free from governmental interference. Therefore, rather than preferring non-believers over believers, holding the Ten Commandments monument to be unconstitutional would treat both groups equally and would ensure an environment of government neutrality in which all individuals would have the freedom to believe as they please.

For the above stated reasons, I respectfully dissent.

## APPENDIX

Justice KIRSHBAUM dissenting.

In this case of first impression,[1] the majority holds that the state may permanently display a religious text indelibly associated with the religions of Judaism and Christianity in a public park. The majority also has determined that although the trial court applied an erroneous legal standard and the parties conducted the trial under a false apprehension of the controlling legal principles, this court should resolve the significant questions here presented on the basis of its review of the evidence adduced at trial. I find the initial conclusion to be contrary to the Establishment Clause jurisprudence developed by the United States Supreme Court and contradictory to the principles of the Preference Clause of article II, section 4, of the Colorado Constitution. In view of the significance of the issues here presented, the importance of the evidentiary portion of this case to those issues, and the interests of the parties, I conclude that the case should be remanded to the trial court for a new trial. I therefore respectfully dissent from the majority's opinion.

I

Initially, I must take exception to the majority's description of the issue before this court. The majority describes that issue as follows: "whether the content and context of a monument, donated to the State for a secular purpose but containing a message of both religious and secular value, displayed among other monuments and tributes on the grounds of the State Capitol, violate the constitutional provisions prohibiting the establishment of or any preference to religion." Maj. op. at 1014. In my view this statement assumes the resolution of certain critical issues that must be determined to decide the

merits of this civil action. The constitutional question is not whether the "content and context" of the Ten Commandments monument violate constitutional prohibitions. The issue we agreed to resolve is whether the state's conduct in electing to display permanently the Ten Commandments monument in a public park violates Establishment Clause or Preference Clause principles. Furthermore, the statements that the monument contains "a message of both religious and secular value" and is "displayed among other monuments and tributes on the grounds of the State Capitol" constitute ultimate factual findings that were not made by the trial court and, as the court of appeals' opinion reflects, are subject to dispute.[2]

The formulation of the issues before us assumes added significance in view of the procedural posture of this case. As the majority notes, the trial was conducted pursuant to an order of remand issued by the court of appeals in 1991. Maj. op. at 1018. The court of appeals directed the trial court to make certain findings of fact in light of the opinion of this court in *Conrad v. City and County of Denver,* 656 P.2d 662 (Colo.1982) (*Conrad I*), and the opinion of the United States Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The court of appeals did not direct the trial court to consider any Establishment Clause or Preference Clause cases decided subsequent to our decision in *Conrad I,* and the trial court's order mentions no case other than those two.

In its opinion in this case, the court of appeals recognized, as does the majority, that the *Lemon* test has been significantly modified by the Supreme Court's decisions in *Allegheny County v. American Civil Liberties Union,* 492 U.S. 573, 109 S.Ct. 3086, 106

1. We have considered challenges to the temporal and seasonal display of a creche in a Christmas holiday setting based on the protections afforded by the Establishment Clause of the First Amendment to the United States Constitution and the Preference Clause of article II, section 4 of the Colorado Constitution. *Conrad v. City and County of Denver,* 724 P.2d 1309 (Colo.1986); *Conrad v. City and County of Denver,* 656 P.2d 662 (Colo. 1983). However, we have not heretofore considered challenges to a permanent display of a religious object on state-owned and state-maintained

property. The difference is significant. *See Allegheny County v. American Civil Liberties Union,* 492 U.S. 573, 608 n. 56, 109 S.Ct. 3086, 3109 n. 56, 106 L.Ed.2d 472 (1989).

2. The trial court did not find that there were "tributes" on the grounds of the State Capitol. The trial court did find that there is a secular "meaning" to many of the commandments and that the commandments "are certainly a basis for our Bill of Rights and our Constitution."

L.Ed.2d 472 (1989), and *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). *Freedom From Religion Found., Inc. v. State,* 872 P.2d 1256, 1262–63 (Colo. App.1993). As the majority also recognizes, the trial court did not apply the appropriate legal criteria. Maj. op. at 1026. The court of appeals then applied the tests established by the Supreme Court in *Lynch* and *Allegheny County* to the facts found by the trial court, to certain portions of the evidence in the case, and to its own determination that the Ten Commandments monument is "physically isolated" from other monuments located in Lincoln Park. *Freedom From Religion Found., Inc.,* 872 P.2d at 1264. The majority applies the tests established in *Lynch* and *Allegheny County* to certain facts found by the trial court, to certain portions of the evidence in the case, to its resolution of certain conflicting evidence in the case, and to its determination that the Ten Commandments monument is not isolated from other monuments located on the Capitol grounds. The court of appeals and the majority may of course elect to resolve the issues in this case by applying the applicable legal standards to the findings of the trial court and to undisputed facts established by the evidence. In my view, neither the court of appeals nor the majority is able to perform that appellate function in this case in view of the paucity of specific trial court findings, the conflicting nature of much of the testimony at trial, and the fact that in presenting their evidence at trial the parties were limited by their justifiable assumption that the legal issues to be resolved were framed only by the legal standards articulated in *Conrad I* and *Lemon.*

I agree that the criteria applicable to this case must be derived from cases decided subsequent to *Conrad I* and *Lemon.* I also agree that the trial court did not apply such criteria. I conclude, however, that the parties were in effect misled by the directive given by the court of appeals in its 1991 remand order with respect to what criteria were applicable to the constitutional questions raised by the pleading. In view of these circumstances, the case should be remanded to the trial court for a new trial. The parties should be permitted to litigate the significant constitutional issues raised by the state's election to permanently display the Ten Commandments monument in a public park with an understanding of the legal criteria this court determines to be applicable to such question.

II

In granting the state's petition for certiorari review of the court of appeals' judgment we agreed to answer the following four questions:

1. Did the [court of appeals'] opinion engage in impermissible appellate fact-finding, for instance, in determining the context of the monument [in a State park], contrary to the explicit finding of the trial court?

2. Did the [court of appeals'] opinion improperly rely on school setting cases?

3. Did the [court of appeals'] opinion contravene precedent by concluding that it is axiomatic that the religious nature of the monument [in a State park] makes it unconstitutional?

4. Did the [court of appeals'] opinion misapply the holdings in *Stone v. Graham,* 449 U.S. 39 [101 S.Ct. 192, 66 L.Ed.2d 199] (1980); *Allegheny County v. American Civil Liberties Union,* 492 U.S. 573 [109 S.Ct. 3086, 106 L.Ed.2d 472] (1989); and *Lynch v. Donnelly,* 465 U.S. 668 [104 S.Ct. 1355, 79 L.Ed.2d 604] (1984)?

In essence, we agreed to determine whether the court of appeals erroneously engaged in appellate fact-finding or improperly applied controlling jurisprudence to the factual circumstances of this case. Although the majority recognizes that these questions are before us, maj. op. at 1015 n. 2, it does not directly answer them. I conclude that all of these questions should be answered in the negative.[3]

---

**3.** The court of appeals pointed out that although the conduct of the state in displaying the Ten Commandments monument violates Establishment Clause prohibitions, the trial court was at liberty to fashion remedies short of removing the monument. *Freedom From Religion Found., Inc.*

## A

The Establishment Clause of the First Amendment to the United States Constitution, applicable to state governmental conduct by means of the Fourteenth Amendment to that Constitution, prohibits state governments from engaging in conduct that may reasonably be perceived by adherents of a particular religion or by non-adherents of religion as endorsing any particular religion or religions or endorsing religion in general over non-religion. *Allegheny County v. American Civil Liberties Union,* 492 U.S. 573, 592, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989);[4] *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1984); *Lynch v. Donnelly,* 465 U.S. 668, 687, 104 S.Ct. 1355, 1366–67, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring); *see Larson v. Valente,* 456 U.S. 228, 244–46, 102 S.Ct. 1673, 1683–85, 72 L.Ed.2d 33 (1982). The Preference Clause of article II, section 4 of the Colorado Constitution prohibits this state's government from engaging in conduct that may reasonably be perceived to prefer any particular religion or religions or religion in general. Colo. Const. art. II, § 4; *Conrad I,* 656 P.2d 662, 670–71 (1983).

The primary question in this case of first impression is whether the election by the State of Colorado to install and permanently maintain a monument containing symbols of special significance to adherents of Christian and Jewish religious denominations in a public park violates either or both of these constitutional provisions. The trial court, purporting to apply criteria articulated by the United States Supreme Court in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971), held that the state's conduct violated neither constitution. The court of appeals concluded that the state's conduct violated the Establishment Clause under the criteria articulat-

ed by the Supreme Court in *Lynch* and *Allegheny County.* The majority acknowledges that the trial court failed to apply the correct legal standards, maj. op. at 1026, but affirms the result reached by the trial court. *Id.*

I also conclude that the trial court failed to apply the applicable legal standards to the facts it found. I would therefore order the case remanded to the trial court for a new trial, to permit it and the parties to resolve the issues raised by the pleadings under the appropriate legal criteria. I also conclude that the plaintiff's assertion that the state's conduct in effect endorses two religions to the exclusion of all others should be evaluated by strict scrutiny analysis. *Allegheny County,* 492 U.S. at 609, 109 S.Ct. at 3109; *Larson,* 456 U.S. at 246, 102 S.Ct. at 1684–85. Assuming, arguendo, that *Allegheny County* and *Lynch* control this case, and that the case need not be remanded for a new trial, I conclude that the state's conduct in this case in permanently displaying in a public park a religious symbol associated with two religions violates the Establishment Clause. I also find such conduct violative of the Preference Clause of Colorado's constitution.[5]

## B

The factual circumstances characterizing a particular governmental display of religious objects are of critical significance in Establishment Clause litigation. *Allegheny County,* 492 U.S. at 598, 109 S.Ct. at 3103–04. The trial court's findings are at best sparse. This fact, in my view, further supports the conclusion that further trial court proceedings should be required to permit the parties to litigate the case with awareness of the standards we hold applicable and to permit the trial court to make adequate findings in light of those standards.

In recognition of the inadequacy of the trial court's findings, the majority recites at

---

*v. State,* 872 P.2d 1256, 1265 (Colo.App.1993). I agree with this observation.

**4.** In *Allegheny County,* 492 U.S. at 573, 109 S.Ct. at 3089–90, Justice Blackmun announced the judgment of the Court and authored the majority opinion of the Court with respect to parts III(A), IV, and V thereof. General references to *Alle-*

*gheny County* in this dissent refer to the majority opinion.

**5.** My reasoning for this conclusion that the state's conduct violates Preference Clause prohibitions differs from that employed by the court of appeals.

great length some of the evidence in the record. Maj. op. at 1015–17. The majority does not, however, delineate what it deems to be undisputed facts from what is a synopsis of portions of witness testimony.[6] For example, the majority recites certain portions of the testimony of Gregory Robbins, a theology expert, as supportive of the majority's conclusion that "the Ten Commandments monument and its countervailing secular text fits within the melange of historical commemorative accounts found in Lincoln Park." Maj. op. at 1025 & n. 19. No witness testified that the text of the Ten Commandments was secular in nature, and the testimony of Dr. Robbins relating to the existence or nonexistence of a "sacred zone" in Lincoln Park is of questionable relevance to the issue of whether the state's permanent display of the Ten Commandments monument may be perceived as an endorsement or a preference of some religion over other religions or of religion over non-religion.

The majority finds that the Ten Commandments monument does not "stand alone", it is located among a veritable cornucopia of other non-religious monuments, tributes and memorials, and in effect is one of many displays arranged al fresco in a "natural museum." Maj. op. at 1025. The majority also states, without denoting whether it is a factual, legal, or quasi-legal observation, that the Lincoln Park monuments "teach[ ] a history of rich cultural diversity...." Maj. op. at 1025. No witness testified that Lincoln Park was designed as, or perceived by, the state to be a museum. The Ten Commandments monument was placed in the park in the mid–1950's. At that time the only other commemorative objects in Lincoln Park were a flagpole, constructed in 1898, and a drinking fountain, constructed in 1923. The Liberty

Bell was transplanted to Lincoln Park from another site in the 1970's, not to add to a museum but in response to a construction project. Nothing in the record suggests the decisions to build the Veterans Memorial in the 1990's and the decision to move the J.P. Martinez statue from north Denver to Lincoln Park in 1989 were motivated by thoughts of creating a "museum."

To the contrary, the primary authoritative evidence on this aspect of the case, a "State Capitol Grounds Landscape Master Plan" completed in January of 1987, states that "[t]he memorials, in general, do not appear to be incorporated into the design of the grounds and seem out of place." Lincoln Park is not comparable to a museum housing many religious paintings. It is significant that while the trial court did not find that the Ten Commandments monument was not isolated, the trial court did make the following comments:

> And as size goes, certainly this monolith is one of the smaller ones. It is there in plain sight on public land for anybody to see. I'll have to say for my own self, I didn't know for sure where it was when I went, as requested by plaintiffs' attorney, to go look at it, although I'm sure I've been by that intersection scores of times on foot.

In its opinion the court of appeals stated that "[t]he monolith in question here is physically isolated from all other monuments in much the same way that the creche in *Allegheny County* was isolated from the other displays and exhibits inside the same courthouse. Indeed, the displays on the east side of the [C]apitol cannot even be seen from Lincoln Park." *Freedom From Religion Found., Inc.*, 872 P.2d at 1264. This state-

---

6. The majority also on occasion resolves conflicting evidence on issues of fact not addressed by the trial court. For example, the majority states that one of the small decorative objects placed on the monument, an all-seeing eye, "has both secular and nonsecular meanings." Maj. op. at 1023–24. In a footnote, the majority elaborates upon this statement, as follows: "The expert witnesses agreed that the 'all-seeing eye' is most commonly used as a secular symbol, giving its use on the one-dollar bill as an example." *Id.* at 1024 n. 15. However, testimony in the record

concerning the religious significance of this particular religious symbol—that it in fact is used in vestments in Catholic ceremonies—would support a finding that this object has primarily religious significance, especially to adherents of the Catholic religion. The majority in effect resolves the tension created by the conflicting testimony. The trial court did not resolve this question of witness credibility. The trial court's one reference to this factual issue consists of the following single sentence: "Above the eagle is something that's been described as the all-seeing eye, surrounded by a pyramid."

ment is supported by the trial court's comments concerning the size and number of monuments located in Lincoln Park and is consistent with the evidence. The difference between the court of appeals' view of the evidence and the majority's view of the evidence is significant because the surroundings of the monument are particularly critical to an evaluation of the effect prong of the *Allegheny County* test. The trial court should be required to make that determination.

The trial court found that the Ten Commandments monument is located "on state property denominated 'Lincoln Park' "—an area more particularly described by the trial court as "the area between Lincoln, Broadway, Fourteenth Avenue, and Colfax Avenue." The trial court defined the Capitol grounds as a much larger tract of land "between East 14th Avenue and Colfax Avenue ... [and] between Grant Street and Broadway." Lincoln Park thus consists of one entire city block; the "Capitol grounds" consists of the equivalent of three city blocks, including Lincoln Park.

The trial court described five additional monuments that it found to be located in the three-block area comprising all of the Capitol grounds: a Veterans Memorial, a Liberty Bell, a monument to the Challenger astronauts, a monument to Armenians,[7] and a monument consisting of a buffalo and an Indian. The trial court then made the following statements:

7. According to the testimony of the Director of the Capitol complex facilities in the Denver Department of Administration, this monument "is called Armenian Guard" and was placed "by a group of Armenians in commemoration of the genocide and is maintained by them as far as flora plans on a yearly basis and so forth."

8. The majority relates several additional facts regarding the Capitol grounds, which facts are not contained in the trial court's findings. The majority states that portions of the Capitol grounds located across Lincoln Street, and thus approximately one block from the Ten Commandments monument, include a monument to soldiers who served and died in the Civil War; a bench dedicated as a Pearl Harbor monument; and "numerous arboreal tributes in honor of non-military activities and events ranging from Arbor Day to soil conservation efforts." Maj. op. at 1015. The majority describes in detail the

If you look at the [C]apitol grounds as a whole, this is certainly a minor monument as the monuments on the [C]apitol grounds go. And the Court determines that the fact of its existence on a corner of the [C]apitol grounds does not foster, prefer, [or] establish any religion.

Thus the trial court neither found nor suggested that the Ten Commandments monument is located within close proximity to any other monument. This is not surprising. The uncontroverted evidence establishes that both the monument commemorating the Armenian genocide and the buffalo and Indian monument are located on the east side of the Capitol, across Lincoln Street, across the Sherman Street line which the Capitol straddles, and invisible to any person standing anywhere in Lincoln Park. The uncontroverted evidence also establishes that the Challenger memorial is located to the east of the Capitol, across Lincoln Street and approximately a full city block away from the Ten Commandments monument. Finally, it is undisputed that the Ten Commandments monument is located some distance away from the two monuments identified by the trial court as standing in Lincoln Park—the Veterans Memorial and the Liberty Bell.[8] The court of appeals' statement that the Ten Commandments monument is physically isolated from all other monuments is properly based on the trial court's findings of fact and on the evidence in the record.

Challenger monument only generally identified by the trial court, referring to "an Aspen grove, comprised of seven trees, that was planted in memory of the Challenger Astronauts...." *Id.* at 1015. The majority also reports the following information concerning features of Lincoln Park: (1) a 20-foot tall statue in the park's northeast quadrant in tribute to J.P. Martinez, a World War II Hispanic medal of honor recipient; (2) a drinking fountain in the northwest quadrant dedicated to a person who aided war survivors in the early part of the century; and (3) a flagpole near the center of the park. *Id.* at 1016. The majority further states that the Ten Commandments monument is located "approximately 50 feet west of the much larger 20-foot tall J.P. Martinez Hispanic Veterans Memorial and about 30 feet east of the larger drinking fountain monument." *Id.* While all these statements of "fact" are based on evidence in the record, they are not facts found by the trial court.

### III

An accurate description of the Ten Commandments monument is as important to the resolution of the issues in this case as is an accurate description of the public park in which it is situated. The trial court described the monument in some detail, as follows:

> It starts out in the English language, "the Ten Commandments, I am the Lord Thy God." Then follow various Roman numerals with a total of Ten Commandments. On the bottom left corner and the bottom right corner are stars of David. In the middle of the bottom is a chi rho, which are Greek letters, which have been described, apparently by all witnesses to refer to CR; that is, Christ in Greek.[9] In English, at the bottom ... is drawn-on scroll which provides ... quote, Presented by Members of the Fraternal Order of Eagles of Colorado. On the sides of the monument are various floral designs which one witness described as being Byzantine.... Above the words "the Ten Commandments" is an eagle and American flag. Above the eagle is something that's been described as the all-seeing eye, surrounded by a pyramid.[10] And there are two drawn tablets at the top left and top right which contain figures which may purport to be letters of some alphabet.

The trial court also described the monument as being "three or four feet high." Although the trial court did not describe the size of the various symbols, letters and sentences appearing on the monument, the evidence unequivocally establishes that the text of the Ten Commandments occupies almost the entire surface of the monument and is the dominant feature thereof.

Both parties introduced evidence at trial to explain the religious, cultural, and historical significance of that text. Decisions concerning the selection of witnesses were necessarily driven by the parties' understanding from the court of appeals' remand order that they were to consider *Conrad I* and *Lemon* as the sources of applicable legal criteria. Although several witnesses testified that some of the sentences comprising the text of the Ten Commandments may be considered statements of moral principles that underlie our system of law, the witnesses agreed that the complete text of the Ten Commandments as a whole is itself a religious symbol associated with the Jewish and Christian religions. The United States Supreme Court recognized this historical fact in *Stone v. Graham*, 449 U.S. 39, 41, 101 S.Ct. 192, 193–94, 66 L.Ed.2d 199 (1980) (per curiam), when it observed that the "Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact."

The trial court in this case found that "there are certain religious messages on this stone." This finding and the undisputed evidence of all the expert witnesses require the conclusion that the Ten Commandments monument displayed permanently in Lincoln Park is a religious symbol associated with the Jewish and Christian religions. The general fact that certain moral and ethical principles expressed by some of the sentences comprising the text are principles that underlie the political, social, cultural, and legal development of this nation, while a true observation, in no manner refutes or undermines the central religious significance of the text as a whole and the monument that so predominantly displays that text. It is, after all, denominated "The Ten Commandments" monument.[11]

The trial court found that the monument also depicts "the star of David, it's got a

---

9. The majority describes the stars of David as "symbols of the Jewish religion," and describes the two letters as "a symbol for the first two letters in the name 'Jesus Christ' developed by the early Christian church and still found in many Catholic churches." Maj. op. at 1016. I agree that these objects are religious symbols of the Christian and Jewish religions.

10. The majority describes the all-seeing eye as an "Egyptian symbol [which] some people view ...

as representing the eye of God." Maj. op. at 1016. The evidence is conflicting with respect to the religious significance of this object. *See supra* n. 6.

11. The majority appears to concede that the monument is religious in character. Maj. op. at 1018–19.

Christian symbol, it's got an Egyptian symbol, it's got patriotic symbols." The trial court apparently assumed that if a governmental display contains symbols that have both religious and secular meaning, the display must be deemed to have neither a religious purpose nor a religious effect for purposes of Establishment Clause analysis.[12]

This assumption, in my view, distorts Establishment Clause analysis of governmental decisions to display religious objects. For purposes of Establishment Clause analysis, the ultimate question is whether a reasonable, objective observer would view the display as demonstrating a governmental purpose to endorse religion or in effect constituting governmental endorsement of religion. *Allegheny County v. American Civil Liberties Union*, 492 U.S. 573, 592, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989). The objective observer may be a member of some particular religion, an atheist, or an agnostic. *Wallace v. Jaffree*, 472 U.S. 38, 52, 105 S.Ct. 2479, 2487, 86 L.Ed.2d 29 (1985). While the entire contents of any particular display must, of course, be considered in the course of answering that question, a religious symbol does not cease being a religious symbol

because it is placed among non-religious symbols. The fact that a particular display contains both religious and non-religious symbols begins rather than ends the inquiry.[13] In this case, the Ten Commandments monument predominately displays the full text of the Ten Commandments—a religious symbol associated with two particular religions—and is a religious symbol for purposes of Establishment Clause analysis.[14]

## IV

As indicated in Part IV(D) of this dissent, I believe that for purposes of the Establishment Clause strict scrutiny analysis must be applied to the state's conduct in permanently displaying on public property a monument allegedly endorsing two particular religions. However, the majority assumes, as did the court of appeals, that the legal standards adopted by the Supreme Court in *Allegheny County* should be applied to the Establishment Clause questions raised in this case.[15] Had it applied those standards, the trial court would have had to answer two basic questions: (1) whether the purpose of the State's conduct in permanently displaying a

---

12. The trial court's following statements illustrate this assumption:

Looking at the monolith as a whole, it appears, as [one witness] said, to be a melange of civil, political, cultural, and religious meanings. And the Court finds that the overall effect of this is not to further or foster any religion— even though there is certainly a mention of God stuff, the overall effect of this is not to foster, to prefer, or establish any religion.

13. The Sixth Circuit Court of Appeals recently held that a framed portrait of Jesus, admittedly a reproduction of a well-known secular work of art, violated the Establishment Clause when displayed in a secondary school's hallway which also contained a nearby trophy case, a painting of the school mascot and a bulletin board. *Washegesic v. Bloomingdale Pub. Sch.*, 33 F.3d 679 (6th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1822, 131 L.Ed.2d 744 (1995).

14. Governments are not precluded from displaying religious symbols in appropriate settings. *Allegheny County*, 492 U.S. at 620–21, 109 S.Ct. at 3115–16. Governments are precluded, however, from displaying religious objects for the purpose of endorsing or preferring particular religions over other religions or religion over non-religion or from displaying religious symbols in such a manner that the effect of the display on objective

religious, atheist, or agnostic observers constitutes such endorsement or preference.

15. The Court has articulated other tests for examining Establishment Clause issues. *See, e.g., Lee v. Weisman*, —— U.S. ——, ——, 112 S.Ct. 2649, 2661, 120 L.Ed.2d 467 (1992) (Establishment Clause prohibits school from compelling students to participate in a religious exercise); *Larson v. Valente*, 456 U.S. 228, 246, 102 S.Ct. 1673, 1684–85, 72 L.Ed.2d 33 (1982) (strict scrutiny analysis applicable to evaluate state legislative program); *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971) (three-part test for analyzing legislation: the statute must reflect a secular legislative purpose, its principal effect must neither advance nor inhibit religion, and it must not foster excessive governmental entanglement with religion); *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 294–95, 83 S.Ct. 1560, 1609–10, 10 L.Ed.2d 844 (1963) (Establishment Clause prohibits involvements of religions with secular institutions "which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular measures would suffice"). The Court has not disavowed any of these tests.

religious symbol in Lincoln Park was to endorse or foster one or more religions or religion in general over non-religion, and (2) whether the effect of such state conduct "is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by non-adherents as a disapproval, of their individual religious choices." *Allegheny County v. American Civil Liberties Union,* 492 U.S. 573, 597, 109 S.Ct. 3086, 3103, 106 L.Ed.2d 472 (1989) (quoting *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985)).[16] Assuming, arguendo, that the criteria articulated in *Allegheny County* are applicable here, in my view the court of appeals correctly concluded that the state's conduct violated the Establishment Clause.[17]

A

While the test articulated in *Allegheny County* seems relatively concise, a brief review of the evolution of that test is useful in considering how the test should be applied here. In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the United States Supreme Court established a tripartite test to measure governmental conduct in cases alleging violations of the Establishment Clause. To survive the intermediate standard of review required by *Lemon,* the statute or conduct must have a secular legislative purpose, its principal or primary effect must be one that neither advances nor inhibits religion, and it must not foster an excessive governmental entanglement with religion. *Id.* at 612–13, 91 S.Ct. at 2111–12. Government conduct may not violate any one of these three prongs. *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).[18]

*Lemon* provided the Court with an early opportunity to examine the delicate balance between appropriate and constitutionally prohibited governmental conduct having religious significance. *Lee,* ⸺ U.S. at ⸺, 112 S.Ct. at 2663 (Blackmun, J., concurring). That jurisprudence emerged primarily from cases wherein plaintiffs challenged govern-

**16.** The majority refers to other tests in the course of its opinion. The majority states that the issue for determination is whether the Ten Commandments monument itself violates the Establishment Clause or "communicates a prohibited endorsement or disapproval of religion." Maj. op. at 1018. The majority also states that it concludes that "the monument's content and its setting ... sufficiently neutralize its religious character resulting in neither an endorsement nor a disapproval of religion." Maj. op. at 1019 (footnote omitted). However, the Supreme Court has recognized that a museum setting does not neutralize the religious content of a religious painting, but may negate "any message of government endorsement of that content." *Allegheny County,* 492 U.S. at 595, 109 S.Ct. at 3102 (quoting *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369) (O'Connor, J., concurring).

The majority states that "if there are countervailing secular passages or symbols in the content of the display or if the context of the display detracts from its religious message, then the display may be constitutional." Maj. op. at 1023. The majority states that "the monument is not located so as to have a coercive effect," maj. op. at 1025, and that one should not "exaggerate the effect of benign religious messages by suggesting they automatically inculcate religion." Maj. op. at 1026. The Supreme Court has expressly emphasized that coercion is not a necessary element of any Establishment Clause claim. *Allegheny County,* 492 U.S. at 597–98 n. 47, 109 S.Ct. at 3103 n. 47, and cases there cited. The majority also states that "any religious meaning of legal consequence must ultimately flow from the character of the state action as perceived by an objective observer, but does not turn on whether the message, though secular, also has religious value." Maj. op. at 1026. It is not clear whether some or all of these formulations indicate tests other than the purpose and effect test established in *Allegheny County.*

**17.** The court of appeals and the majority apparently assume that based on *Conrad v. City and County of Denver,* 656 P.2d 662 (Colo.1983) (*Conrad I*), and *Conrad v. City and County of Denver,* 724 P.2d 1309 (1986) (*Conrad II*), whatever tests the Supreme Court might adopt for Establishment Clause purposes automatically becomes the tests applicable to Preference Clause issues. In my view, *Conrad I* and *Conrad II* did not adopt so rigid a formula. Furthermore, this assumption does not begin to address the difficulties created by the Supreme Court's acknowledgement that it has developed more than one test for resolution of Establishment Clause claims.

**18.** In *Lemon,* 403 U.S. at 619–21, 91 S.Ct. at 2114–15, the Court determined that although a state statute authorizing direct aid to religious and other private schools for teaching secular subjects had a secular purpose, because substantial state supervision was required to implement the aid, the statute fostered an impermissible degree of entanglement between government and religion. The Court did not apply the purpose prong of the test it articulated.

ment conduct requiring student participation in sectarian prayers in school classrooms. The Court has never viewed the *Lemon* test as constituting the sole mode of analysis for claims alleging governmental violations of the Establishment Clause. To the contrary, the Court has emphasized its "unwillingness to be confined to any single test or criterion in this sensitive area." *Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984); *see also Lee,* —— U.S. at ——, 112 S.Ct. 2649; *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983); *Larson,* 456 U.S. at 228, 102 S.Ct. at 1674–75. In *Larson,* the Court emphasized that the *Lemon* criteria "are intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions ... that discriminate *among* religions." *Larson,* 456 U.S. at 252, 102 S.Ct. at 1687 (emphasis in original) (footnote omitted).[19]

In *Lynch,* Justice O'Connor made the following statements concerning her view that the purpose and effect prongs of the *Lemon* test should be revised to more faithfully reflect Establishment Clause principles:

> The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community.... [Government endorsement of religion] sends a message to *nonadherents* that they are outsiders, not full members of the political community, and an accompanying message to *adherents* that they are insiders, favored members of the political community. Disapproval sends the opposite message.

*Lynch,* 465 U.S. at 687–88, 104 S.Ct. at 1367 (O'Connor, J., concurring) (emphasis added); *accord Allegheny County,* 492 U.S. at 593, 109 S.Ct. at 3100–01; *School Dist. of Grand Rapids,* 473 U.S. at 390, 105 S.Ct. at 3226.

In *Allegheny County,* the Court adopted a test requiring determination of "whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence." *Allegheny County,* 492 U.S. at 592, 109 S.Ct. at 3100. In so doing, the Court made the following observation:

> The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from "making adherence to a religion relevant in any way to a person's standing in the political community."

*Id.* at 594, 109 S.Ct. at 3101 (quoting *Lynch,* 465 U.S. at 687, 104 S.Ct. at 1366–67 (O'Connor, J., concurring)).

The endorsement test proposed by Justice O'Connor in *Lynch* and adopted by the Court in *Allegheny County* has modified both the purpose and effect prongs of *Lemon.* With respect to the issue of governmental purpose, the inquiry becomes whether the purpose of the conduct is to endorse religion rather than whether such conduct has a secular purpose. This shift in emphasis suggests that courts should no longer attempt to determine whether decidedly religious symbols in some manner lose their religious significance when placed in close proximity to non-religious symbols.

The Court's modification of the effect prong of the *Lemon* test is also significant. Under *Lemon,* the effect portion of the inquiry focused on the extent to which challenged government conduct in fact advanced or inhibited religion. Under the *Allegheny County* test, attention is focused on the question of whether a reasonable, objective observer would perceive the government conduct as endorsing particular religions or religion in

---

19. The Court has on occasion refused to apply the *Lemon* formulation to Establishment Clause claims. In *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the Court did not employ the *Lemon* test in determining that government conduct in conducting a prayer at the outset of each day of a legislative session did not violate Establishment Clause principles. In *School Dist. of Grand Rapids v. Ball,* 473 U.S. 373, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), the Court employed an endorsement test in concluding that governmental conduct utilizing *public* school teachers to provide instruction to religious school students in classrooms leased from religious schools violated the Establishment Clause. In *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), the Court found the *Lemon* test inappropriate for analysis of a state statute alleged to be discriminatory against some religious organizations and instead applied a strict scrutiny analysis. *See also Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1984); *Lee v. Weisman,* 505

general. *Allegheny County*, 492 U.S. at 592, 109 S.Ct. at 3100. As applicable in *Allegheny County* and here, this standard requires consideration of the perspectives of reasonable observers who are neither Christian nor Jewish as well as the perspectives of those who adhere to either of these religions. *Id.* at 620, 109 S.Ct. at 3115.

There is tension between the reasonable observer concept adopted in *Allegheny County* and Justice O'Connor's recognition that government conduct may neither be perceived as granting a favored, insider status to adherents of a particular religion nor be perceived as displaying disfavor or creating outsider status to non-adherents. *Lynch,* 465 U.S. at 687–88, 104 S.Ct. at 1366–67 (O'Connor, J., concurring). The tension is somewhat dissipated by the Court's recognition that the *Lemon* formulation is not the sole means of resolving Establishment Clause challenges. *Lynch,* 465 U.S. at 679, 104 S.Ct. at 1362. It is further dissipated by the Court's recognition that the *Lemon* criteria are not applicable to government conduct that allegedly discriminates among religions. *Larson,* 456 U.S. at 252, 102 S.Ct. at 1687–88. Finally, the "reasonable observer" standard appears to incorporate an "educated" reasonable observer concept—a person "acquainted with the text, legislative history and implementation of the statute." *Wallace,* 472 U.S. at 76, 105 S.Ct. at 2500 (O'Connor, J., concurring).[20]

### B

The majority has elected to resolve the issues raised by the pleadings by applying the *Allegheny County* test to certain evidence contained in the record. It first finds that the "text includes symbols of at least two significant religions, Judaism and Christianity, whose teachings are in substantial conflict with each other." Maj. op. at 1023 (footnote omitted). The Ten Commandments monument includes several texts, the most prominent of which is the text of the Ten

Commandments as composed by representatives of Christian and Jewish religions. The majority finds that the "juxtaposition of the Christian Chi and Rho with the Jewish Star of David reflects an acknowledgement of reconciliation and diversity more than any sentiment of intolerance." *Id.* While this interpretation of the symbolic significance of the monument as a whole finds some support in the record, some witnesses testified that the two objects are singularly and unmistakenly religious in character. As the majority concedes, a statement to the effect that the purpose of the monument is to portray concepts of reconciliation and diversity would help clarify the question of the state's purpose in displaying the monument. *Id.* at 1024. No such statement exists.

The record contains no direct evidence of the state's purpose in permanently displaying the Ten Commandments monument in Lincoln Park. The majority determines that such purpose "is consistent with the stated secular purpose of the donation," citing lengthy portions of an affidavit of a retired Minnesota juvenile court judge who initiated a National Youth Guidance Program in the 1940's that included the posting of copies of the Ten Commandments through the nation. *Id.* at 1024. I find no basis in the evidence to support the majority's determination that the purpose of the state in permanently displaying the monument in 1990 was consistent with the purpose attributed to the donors of the monument in the mid–1950's, and therefore cannot conclude that the state's purpose in 1990 was not to endorse the two religions identified with the Ten Commandments monument. However, as I previously indicated, I believe both parties should be given an opportunity to litigate the issues in this case with knowledge of the legal criteria that govern those issues.

The majority also concludes that the state's permanent display and maintenance of the Ten Commandments monument in Lincoln Park does not in effect constitute

U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

**20.** Justice O'Connor has suggested that the reasonable observer/endorsement formulation is prompted in part by a desire to reconcile concededly competing interests embodied in the

Free Exercise Clause and the Establishment Clause of the First Amendment to the United States Constitution. *Wallace,* 472 U.S. at 82–84, 105 S.Ct. at 2503–04 (O'Connor, J., concurring). No Free Exercise challenge has been asserted in this case.

endorsement of the two religions associated with that religious symbol or of religion in general. The majority states that the monument is found in "what is much like a museum setting" and that "[t]he various monuments found around the park in fact represent a cornucopia of different cultural events and experiences that make up the history of our nation and reflect upon a history that is also Colorado." *Id.* at 1025. The trial court made no such findings, and no witness suggested that either the one-block area known as Lincoln Park or the three-block expanse constituting the Capitol grounds constitutes a museum-like setting.

As applied to this case, the effect test articulated in *Allegheny County* requires judicial determination of whether a reasonable person, whether an adherent of any particular religion or an adherent of no religion, viewing the Ten Commandments monument as it is permanently displayed in Lincoln Park, would conclude from such viewing that the state is endorsing the two religions associated with that symbol or is endorsing religion in general. The court of appeals, applying this test to the trial court's findings and to undisputed evidence contained in the record, concluded that the state's conduct in effect constitutes state endorsement of religion, in contravention of the Establishment Clause. I agree with the court of appeals' conclusion.

Four courts have had occasion to examine the constitutionality of governmental displays of various versions of the Ten Commandments. Three of those courts, including the Supreme Court, found the challenged government conduct to be prohibited by the Establishment Clause. In *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), the Court in a per curiam opinion held that a Kentucky statute requiring the posting of a version of the Ten Commandments in all public elementary and secondary school classrooms had no secular legislative purpose in spite of the fact that the statute required the display of the Ten Commandments to be accompanied by a notation to the effect that the Ten Commandments influenced the fundamental legal code of Western Civilization and the common law of this nation. In *Ring*

*v. Grand Forks Public School District,* 483 F.Supp. 272 (D.N.D.1980), the court concluded that a North Dakota statute requiring the posting of a placard containing the Ten Commandments of the Christian religion in public elementary, secondary, and higher education classrooms violated the purpose prong of the *Lemon* test. In *Harvey v. Cobb County, Georgia,* 811 F.Supp. 669 (N.D.Ga.1993), the court rejected the argument that a display of the Ten Commandments merely represented a "historical, jurisprudential cornerstone of American legal significance"; concluded that the Ten Commandments constitute a sacred text in the Jewish and Christian faiths; and determined that in the context of its location in the county courthouse the display had the effect of endorsing religion.

In *Anderson v. Salt Lake City Corp.,* 475 F.2d 29 (10th Cir.1973), the Tenth Circuit Court of Appeals, applying the then recent *Lemon* test, reversed determinations by the trial court that a monument substantially similar to the Ten Commandments monument under consideration in this case was clearly religious in character and was adopted with the purpose and primary effect of advancing religion. The appellate court concluded that the monument was primarily secular in nature and that neither its purpose nor its effect tended to establish religious belief. The judgment and reasoning of *Anderson* is inapposite here because the test there applied is no longer applicable to claims asserting governmental violations of the Establishment Clause.

I find the reasoning of the *Harvey* court—the most recent judicial evaluation of a governmental display of the Ten Commandments on public property—to be persuasive. As in *Harvey,* in this case the text as displayed on the Ten Commandments monument constitutes an unmistakable religious symbol of two religions, Christianity and Judaism. The two Stars of David and the Chi and Rho are also religious symbols of these religions. No effort has been made by the state to inform persons viewing the Ten Commandments monument of any secular significance this monument might arguably have. Under these circumstances, I conclude that the court of appeals correctly held

that the display of the Ten Commandments in Lincoln Park conveys the impression to any reasonable, objective observer that the State of Colorado endorses the Jewish and Christian religions or endorses religion in general. An agnostic, atheist or member of some religion other than Christianity or Judaism would reach the same conclusion upon viewing the Ten Commandments monument as it is displayed in Lincoln Park.[21] The Establishment Clause prohibits such governmental conduct.

### D

The majority has concluded that the *Allegheny County* test is applicable to the Establishment Clause challenge here raised. However, in view of the trial court's findings that the Ten Commandments monument contains religious symbols of significance to two specific religions rather than to religion in general, the appropriate mode of Establishment Clause analysis in this case is the strict scrutiny standard adopted by the Supreme Court in *Larson*. *Allegheny County*, 492 U.S. at 609, 109 S.Ct. at 3109.

In *Larson* the Court examined a statute that exempted certain religious organizations from registration and reporting requirements applicable to other charitable organizations. The Court found the *Lemon* test inapplicable and concluded that strict scrutiny analysis was appropriate because the statute granted preferences to several particular religious denominations. *Larson*, 456 U.S. at 246, 102 S.Ct. at 1684–85. To survive strict scrutiny analysis, the state must establish a compelling governmental interest for its conduct and also establish that its conduct achieves that purpose by the most narrowly tailored means. *Id.* The state has failed to establish that its conduct in installing and maintaining a monument predominantly displaying symbols associated with two particular religions in a public park furthers a compelling governmental interest. The state's conduct

therefore violates the prohibitions of the Establishment Clause.

### V

The state has chosen to install and permanently maintain on state property a monument displaying the text of the Ten Commandments and other symbols of Judaism and Christianity. This conduct creates a perception in reasonable, objective persons viewing the monument that the state prefers those two religions over other religions and that the state prefers persons who subscribe to some religion over persons who subscribe to no religion. In my view, such governmental conduct violates article II, section 4 of the Colorado Constitution.

Article II, section 4 of the Colorado Constitution contains the following provisions:

> **Religious freedom.** The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed; and no person shall be denied any civil or political right, privilege or capacity, on account of his opinions concerning religion; but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, excuse acts of licentiousness or justify practices inconsistent with the good order, peace or safety of the state. No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent. *Nor shall any preference be given by law to any religious denomination or mode of worship.*

Colo. Const. art. II, § 4 (emphasis added). The last sentence of the quoted text is commonly referred to as "the Preference Clause."

In *Conrad I*, we held that the *Lemon* test should be applied to determine whether a nativity scene erected and maintained in front of the Denver City and County Building during the Christmas holiday season violated the Preference Clause. *Conrad I*, 656

---

21. Anyone affiliated with a Christian sect or a Jewish denomination viewing this four-foot monument in its corner of Lincoln Park must conclude that the state has chosen to memorialize her or his religion. Such viewer must at the very

least conclude that the state prefers persons affiliated with some religious entity over atheists, agnostics, and other persons who do not adhere to any particular religion.

P.2d 662, 672 (Colo.1983). However, we observed that the *Lemon* test was appropriate for judicial analysis of governmental actions "affording a uniform benefit to all religions, and that 'strict scrutiny' is appropriate in reviewing laws that discriminate among religions." *Conrad I,* 656 P.2d at 671 (citing *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982)). Recognizing that both constitutional provisions " 'embody the same values of free exercise and governmental non-involvement,' " we stated that we would look to the body of First Amendment law that has been developed in the federal courts "for useful guidance." *Conrad I,* 656 P.2d at 670–71 (quoting *Americans United for Separation of Church and State Fund, Inc. v. State,* 648 P.2d 1072, 1081–82 (Colo. 1982)). We also emphasized that the specific language and purpose of the Preference Clause of the Colorado Constitution must be considered in this process. *Conrad I,* 656 P.2d at 671.

In *Conrad v. City and County of Denver,* 724 P.2d 1309 (Colo.1986) (*Conrad II* ), we adhered to our determination in *Conrad I* that the *Lemon* test should be applied to the question of whether under all the relevant circumstances the city's conduct violated the Preference Clause. However, we again emphasized that particular factual circumstances could constitute a violation of the Preference Clause of Colorado's Constitution but not constitute a violation of the Establishment Clause. *Conrad II,* 724 P.2d at 1316. I wrote separately in *Conrad II* to express my view that our decision in that case was limited in scope and stated that, "[i]n view of the absolute language of article II, section 4, of the Colorado Constitution, a governmental decision to expend public funds to display scenes of special religious significance to a particular religion might in other circumstances constitute discrimination among religions and, therefore, demand a strict scrutiny analysis." *Id.* at 1317 (Kirshbaum, J., specially concurring). I believe

this case presents such other circumstances.[22]

In *Larson v. Valente,* 456 U.S. at 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), the United States Supreme Court held that a Minnesota statute granting exemptions from registration and reporting requirements of Minnesota's Charitable Solicitations Act, Minn.Stat. §§ 309.50–309.60 (1969 & Supp.1982), to religious organizations that received more than fifty percent of their total contributions from members or affiliated organizations violated the Establishment Clause. The statute, initially adopted in 1961, provided in general that charitable organizations other than religious organizations must comply with broad registration and disclosure requirements and was designed to protect persons contributing to such organizations and persons receiving donations from such organizations from fraud. *Larson,* 456 U.S. at 230–31, 102 S.Ct. at 1676–77. In 1978, the statute was amended to include the fifty percent rule at issue. The Court concluded that the statute had the effect of preferring some religious denominations over others and held that such denominational preference by the state violated the Establishment Clause. *Id.* at 230, 102 S.Ct. at 1676.

In reaching these conclusions, the Court emphasized that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Id.* at 244, 102 S.Ct. at 1683. Noting that the fifty percent rule granted "denominational preferences of the sort consistently and firmly deprecated in our precedents," *id.* at 246, 102 S.Ct. at 1684, the Court applied strict scrutiny analysis to the statute.

The Ten Commandments monument at issue in this case is permanently maintained by the state on state property. The monument prefers Christianity and Judaism over all other religions and also signifies government preference of religion over non-religion. The language and purpose of the Preference

**22.** The majority apparently assumes *sub silentio* that the *Allegheny County* test now governs Preference Clause decisions. Should the Supreme Court at some future time modify, enhance, or reject *Allegheny County,* the then-new criteria, whatever their content, would presumably become the Preference Clause criteria. In my view, such a process is not conducive to sound construction of the unique language contained in Colorado's Preference Clause.

Clause compels application of strict scrutiny analysis to such governmental conduct.[23]

Under *Larson*, to survive strict scrutiny analysis the state must establish a compelling interest for its conduct and must establish that such conduct is narrowly tailored in furtherance of that compelling interest. *Id.* at 246–47, 102 S.Ct. at 1684–85. In this case, the state has introduced no evidence suggesting that its election to erect and maintain the Ten Commandments monument serves a compelling state interest. Its conduct therefore violates the Preference Clause.

Our Preference Clause was adopted in 1876. The states of Wisconsin and Idaho had previously adopted similar constitutional language—language markedly different from the provisions of the Establishment Clause. Several other states have adopted constitutional provisions containing language comparable to the provisions of this state's Preference Clause.[24] Few decisions exploring the meaning of such provisions have been reported.

However, in *Fox v. City of Los Angeles*, 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978), the California Supreme Court did examine the distinctive language of California's constitution in holding that a display of a single-barred cross on the Los Angeles city hall during the Christmas holiday season and during both Latin and Eastern Orthodox Easter Sundays violated provisions of that constitution.[25] The court determined that the display constituted an impermissible governmental preference of one religion or several religions over other religions. *Id.* 150 Cal.Rptr. at 869, 587 P.2d at 665. The court distinguished *Anderson v. Salt Lake City*

*Corp.*, 475 F.2d 29 (10th Cir.1973), observing that under California's constitution the monument examined in *Anderson* would constitute a prohibited preference for one or several religions because such monument did not contain "Coptic, Universalist, or Scientology crosses, the Buddhist wheel, Shinto torii, Confucian yang-yin, Jain swastika, Zoroastrian vase of fire, or Unitarian flaming chalice." *Fox*, 587 P.2d at 665. The court concluded that the city's election to illuminate only the single-barred cross in effect constituted a preference for the Christian religion over other religions. *Id.* at 666.

Colorado's governmental institutions certainly need not eschew appropriate recognition of the significance of values, thoughts, principles, and practices of various religions to the legal, cultural, and political development of this state and this nation. However, the Preference Clause of Colorado's constitution at the least prohibits governmental conduct that appears to a reasonable, objective observer to prefer one religion or several religions over other religions or to prefer religion in general over non-religion. In my view, strict scrutiny analysis is required to ensure the continuing viability of these principles.[26]

The Ten Commandments monument constitutes a permanent government display of symbols associated with the Jewish and Christian faiths. No other monument located in Lincoln Park or on other portions of the Capitol grounds constitutes a religious symbol. The state has offered no evidence to support the conclusion that the permanent display of this religious symbol furthers a compelling state interest. In the absence of

23. In so concluding, I by no means discount the significance of the suggestion in *Conrad I* that the strict scrutiny test articulated by the Supreme Court in *Larson* might in some circumstances prove insufficiently protective of the values protected by the Preference Clause. *Conrad I*, 656 P.2d at 671–72.

24. *See* Ala. Const. art. I, § 3; Ark. Const. art. II, § 25; Calif. Const. art. I, § 4; Conn. Const. art. I, § 3; Del. Const. art. I, § 1; Fla. Const. Declaration of Rights, § 3; Idaho Const. art. I, § 4; Ind. Const. art. I, § 4; Kan. Bill of Rights, § 7; La. Const. art. I, § 8; Me. Const. art. I, § 3; Mass. Const. Amend. XI; Minn. Const. art. I, § 16; Miss. Const. art. III, § 18; Neb. Const. art.

I, § 4; N.M. Const. art. II, § 11; Ohio Const. art. I, § 7; Pa. Const. art. I, § 3; S.D. Const. art. VI, § 3; Tenn. Const. art. I, § 3; Tex. Const. art. I, § 6; Wis. Const. art. I, § 18.

25. California's constitution provides that the "[f]ree exercise and enjoyment of religion without discrimination or preference, are guaranteed." Calif. Const. art. I, § 4.

26. Such proscription is no more restrictive than current Establishment Clause principles. *Lee v. Weisman*, — U.S. —, —, 112 S.Ct. 2649, 2667, 120 L.Ed.2d 467 (1992) (Souter, J., concurring).

such evidence, the state's conduct violates the Preference Clause of Colorado's constitution.

## VI

In sum, I believe this case should be remanded to the trial court for a new trial, thus permitting it and the parties to address the issues in this case in light of whatever criteria we determine to be applicable to the significant Establishment Clause and Preference Clause questions raised by the pleadings. I believe a strict scrutiny standard must be applied to all of those issues. Assuming, arguendo, that the standards articulated by the United States Supreme Court in *Allegheny County v. American Civil Liberties Union*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), are applicable for purposes of Establishment Clause and Preference Clause analysis in this case, and that those standards should be applied by this court in the course of this appeal, I conclude, as did the court of appeals, that the state's election to permanently display the Ten Commandments monument in Lincoln Park constitutes endorsement of and preference for religion, in violation of the provisions of both the Establishment Clause and the Preference Clause. I therefore respectfully dissent from the majority opinion.

ERICKSON, J., joins in my conclusion to remand for new trial.